**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jack DeCORTE, Defendant–Appellant.**

**No. 87–2004.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1988.

Decided July 12, 1988.

M. Jacqueline Walther, George P. Lynch, Ltd., Chicago, Ill., for defendant-appellant.

Stephanie L. Uhlarik, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

After a bench trial, a federal district judge convicted appellant, Jack DeCorte, Jr., of criminal conspiracy, 18 U.S.C. § 371 (1982 and Supp. IV 1986); possession of property stolen from an interstate shipment, 18 U.S.C. § 659; and transporting stolen property in interstate commerce, 18 U.S.C. § 2314. DeCorte appeals, arguing that the government failed to prove him guilty beyond reasonable doubt and that his convictions for possession and transportation of stolen property resulted in dual punishment for a single crime. We find no merit in either of DeCorte's contentions and we affirm his convictions.[1]

## FACTS

On January 23, 1984, FBI agents went to R & M Truck and Trailer Repair ("R & M"), in Bensenville, Illinois. In R & M's garage, the agents discovered two semi-trailer loads of television sets that had been stolen a week earlier from a Zenith Electronics Corporation ("Zenith") storage lot in Milton, Pennsylvania. On December 1, 1986, following an FBI investigation, a federal grand jury indicted Dennis Armenta and DeCorte, charging both with the three offenses for which DeCorte now stands convicted. Armenta, who was present at the R & M garage when FBI agents discovered the stolen trailers, plead-

ed guilty. DeCorte, who had driven one of the trailers from Milton to Bensenville, proceeded to trial. At trial, DeCorte maintained that he was merely an innocent dupe and had no idea that the trailers were stolen.

Jerry Blankenship, DeCorte's partner in a freight brokerage business called Blade Shippers, testified for the government. Blankenship testified that DeCorte approached him at the Blade Shippers office on Friday, January 13, 1984, and tried to enlist him to help bring two trailer loads of television sets to Illinois from Pennsylvania. DeCorte told Blankenship that they would be paid $3,000 per trailer for the approximately seven hundred mile trip, about four times the ordinary rate for a trip of that length. Moreover, they would not be pulling any freight from Illinois to Pennsylvania, but would be "bobtailing," or driving tractors without trailers, on the outbound leg of the trip. Blankenship testified that bobtailing such a distance is very rare; he had done it only once before in twenty-eight years in the trucking business. When Blankenship asked DeCorte about the unusually high price they were to be paid, DeCorte told him that "they were hot loads." (In the trucking business, "hot" may mean stolen, but also may refer to goods which must be moved very quickly.) Blankenship refused to participate and warned DeCorte not to use company tractors in the venture. Blankenship testified that he had no knowledge that DeCorte had gone through with the plan until Saturday, January 14, 1984, when he discovered that two tractors were missing from the Blade Shippers parking area.

Blankenship testified that he next saw DeCorte on Tuesday, January 17, 1984, when DeCorte returned with the tractors. Blankenship asked DeCorte where he had been. DeCorte told Blankenship that he (DeCorte) had just gotten back from Pennsylvania, and that he had not yet been paid for the trip, but needed "to make a couple of phone calls to collect his money." Later that day, Blankenship was present when

---

1. DeCorte also has raised other issues on appeal, but after consideration of those issues we deem them meritless and see no need to address them further.

DeCorte made a telephone call from the Blade Shippers office. DeCorte argued with the other party on the telephone, asking why he could not have his money then, and when he could have it. After DeCorte hung up, he tucked a gun into his belt and said he was "going to get his money." Blankenship testified that DeCorte told him, "I better not open my mouth about the trip because it had gotten screwed up and if anybody found out from me I'd get my head blowed off."

At trial, the government also called James Snodgrass, who drove the second trailer from Milton to Bensenville. Snodgrass testified that DeCorte asked him to drive the second tractor-trailer unit after Blankenship refused to do so. DeCorte offered Snodgrass $200.00 to make the weekend trip, a sum equal to Snodgrass's weekly salary. Snodgrass agreed and he met DeCorte en route to Pennsylvania at a designated fuel stop on the Indiana Tollway. The two then bobtailed together to Milton. Snodgrass testified that he had never bobtailed this distance in nine years as a truck driver. Snodgrass also testified that the tractors he and DeCorte drove bore "Cougar Express" insignia. (Blankenship later testified that use of those tractors was improper, because Cougar Express, a New Jersey trucking firm, had not authorized the trip.) Moreover, DeCorte and Snodgrass lacked the permits required to enter Pennsylvania.

Snodgrass and DeCorte arrived in Milton at about 2:30 p.m. on Monday, January 16. They pulled their tractors into the Milton Truck Stop, where they refueled the trucks and ate lunch. DeCorte then made a telephone call from the truck stop. After the phone call, DeCorte told Snodgrass that the trailers had not arrived yet, but would arrive later that evening. At about 7:00 p.m., DeCorte made another telephone call, and this time he reported to Snodgrass that the trailers were ready. They then drove to a nearby lot in which approximately twenty Zenith trailers were parked. No one else was in the area. DeCorte told Snodgrass the numbers of the trailers they were to pick up, they found them, and they hooked the trailers onto their tractors. They then pulled out of the lot and set out toward Chicago.

Snodgrass testified that he and DeCorte took Interstate 80 on their return trip to Chicago, and because DeCorte said they were to be back in Bensenville by 8:00 a.m. the next day, they averaged nearly seventy miles per hour on the return trip. At approximately 7:45 a.m. on Tuesday, January 17, the shipment reached the Skyway Plaza outside Chicago. The drivers stopped there and DeCorte made more telephone calls. After the telephone calls, DeCorte and Snodgrass drove the tractor-trailer units to Bensenville, to what appeared to be an auto-body repair shop. A man met them there and opened the garage door. Snodgrass and DeCorte backed the two trailers into the garage (although there was barely enough room for them), unhooked the trailers, and returned the tractors to the Blade Shippers lot. Snodgrass saw no bills of lading or other paperwork and he and DeCorte kept no log books during the entire trip.

About a week after the trip, Snodgrass saw a television news report concerning the stolen trailers. The next time Snodgrass saw DeCorte, approximately a week after the news report, Snodgrass confronted DeCorte and asked him whether the trailers reported stolen were the ones they had brought to Bensenville from Milton. DeCorte replied, "Yeah, they're hot." He also told Snodgrass that they would not be paid for the trip because the original buyers had been scared off. Finally, DeCorte told Snodgrass that the entire matter should be kept "hush-hush."

Dorothy Steinman, a carriers' agent and property broker, also testified for the government. Steinman testified that she first met DeCorte in November or December 1983 when she contacted Blade Shippers to do some local hauling. On approximately Monday, January 23, 1984, DeCorte came to her office to be paid for work he had done for Steinman's firm. While he was in Steinman's office, DeCorte asked if she could do him a favor. DeCorte said that he "had some problems in Pennsylvania, around Milton," and asked Steinman to

say that DeCorte was moving freight for one of the companies she represented, should anyone ask about him. She refused to comply with DeCorte's request.

DeCorte based his defense on his own testimony and on his impeachment of Blankenship's credibility. DeCorte testified that the venture began when he received a call from someone named Joe Russo, who asked DeCorte to pick up the trailers in Pennsylvania and drive them back to the Chicago area. Russo offered DeCorte $1,400.00 per trailer for the trip. DeCorte claimed that Russo said nothing to indicate that the shipment would be stolen. DeCorte admitted that he asked Blankenship to join him, but denied that he told Blankenship that the loads were "hot" or that they were to be paid $3,000.00 per trailer. DeCorte testified that Russo provided him with bills of lading for the loads and Zenith identification cards for the drivers. DeCorte contended that he kept all the paperwork himself during the trip, then returned it to Armenta at R & M. He kept no copies for himself. DeCorte denied that he had a telephone conversation regarding payment for the loads after he returned. Instead, he testified that he went to R & M on Wednesday, January 18, to see about payment. While there, he saw that the Zenith logos were being scraped off the trailers. DeCorte claimed that this was the first time he suspected that the trailers might be stolen. On cross-examination, however, prosecutors impeached DeCorte by eliciting his admission that he had lied to FBI agents during their investigation, telling the agents that he did not recall hauling any trailers from Milton to Bensenville.

DeCorte also impeached Blankenship, both by attempting to show that Blankenship was biased and also by the introduction of testimony impugning Blankenship's reputation for truthfulness. First, DeCorte exposed Blankenship's possible bias by showing that he and Blankenship did not get along, and that Blankenship himself recently had been investigated by the FBI for hauling stolen property. (Blankenship denied, however, that he had received any promises of leniency in exchange for his testimony.) DeCorte also testified that

he considered Blankenship an untruthful person and that Blankenship had lied to him. Defense witness Karen Schultz, a former secretary at Blade Shippers, also testified that Blankenship had not been truthful with her.

Following the trial, the court announced its decision, finding DeCorte guilty of all three offenses charged. Initially, the judge stated that he found DeCorte's testimony "unworthy of belief." Specifically, the judge found that

> [DeCorte's] story about how he became involved in this with Mr. Russo, with these mysterious papers and these mysterious identity cards, on a shipment for Zenith makes no sense to me.
>
> The story about how a trucker would turn over bills of lading and not retain a copy for himself on his first job [for that party] is unbelievable to me.

The judge also observed that DeCorte had admitted lying to FBI agents, thus calling into question his truthfulness. The judge further relied on the testimony of prosecution witnesses Blankenship and Steinman. The judge specifically noted Blankenship's "obvious motives in this case to help himself with the United States Government," but found that Blankenship's testimony was bolstered by Steinman's testimony regarding DeCorte's attempt to arrange an alibi. Thus, the trial judge found that the evidence demonstrated beyond reasonable doubt that DeCorte knew that the trailers were stolen and had agreed knowingly to participate in the theft.

## DISCUSSION

### I. Sufficiency of the Evidence

DeCorte raises two challenges to the sufficiency of the evidence on which he was convicted. Initially, DeCorte contends that the prosecution failed to demonstrate that he knew that the trailers were stolen, thus he cannot be convicted of either knowingly transporting or knowingly possessing stolen property. Similarly, DeCorte argues that the government failed to prove that DeCorte agreed to join in a conspiracy to steal the trailers, so the court could not

find him guilty of conspiracy. Our review of the record in this case convinces us that the district court's decision is supported with more than sufficient evidence to demonstrate DeCorte's guilt beyond reasonable doubt on all charges.

■ We review the sufficiency of evidence to support a criminal conviction under a highly deferential standard. We will affirm the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also, e.g., United States v. Garner*, 837 F.2d 1404, 1422–23 (7th Cir. 1987); *United States v. Whaley*, 830 F.2d 1469, 1472–73 (7th Cir.1987); *United States v. Hammond*, 826 F.2d 577, 579–81 (7th Cir.1987). We will not reweigh the evidence or reassess the credibility of witnesses, but will overturn a conviction "[o]nly when the record contains no evidence regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." [2] *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (quoting *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970)); *see also Whaley*, 830 F.2d at 1472–73. Our standard of review is fatal to DeCorte's contentions.

DeCorte candidly concedes that Blankenship's testimony provides significant evidence of DeCorte's guilty knowledge. We

agree. Blankenship testified that DeCorte tried to recruit him to drive a "hot" load for an extraordinarily high price, and made a point of returning to threaten Blankenship to keep quiet about the trip or have his "head blowed off." This evidence is sufficient to support the court's conclusion that DeCorte knew the trailers were stolen. DeCorte contends, however, that Blankenship's testimony is insufficient to convict him because he successfully impeached Blankenship's credibility. In addition, DeCorte claims that evidence that he exceeded the speed limit and used unauthorized trailers shows that he could not have realized that the trailers were stolen, or he would have been more careful. We disagree.

■ First, as we said above, it is not the role of an appellate court to reexamine credibility determinations or reweigh the evidence. *See, e.g., Garner*, 837 F.2d at 1422–23; *Whaley*, 830 F.2d at 1472–73; *Hammond*, 826 F.2d at 579. Several reasons support this limitation on the role of the federal appellate courts. On the most pragmatic level, decisions about the weight of evidence or the credibility of witnesses rest on findings of fact. Those decisions are therefore protected by Congress's express limitation of our power of review, as expressed in Rule 52(a).[3] Strong policy considerations underlie Congress's apportionment of factfinding authority. Initially, factfinding itself is a specialized task for which appellate courts are ill-equipped. "The trial judge's major role is the determi-

---

**2.** Lest the reference to "no evidence" in the above-quoted passage cause confusion, we note that we are well aware that *Jackson v. Virginia* discarded the old "no evidence" standard for review of criminal convictions. *Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789. Thus, when we review a criminal conviction to test the sufficiency of the evidence, we do not require the defendant to demonstrate that no evidence at all supports the conviction, but rather that the evidence cannot support a finding of guilt beyond reasonable doubt. As we read our language from *Redwine*, it is consistent with *Jackson*. The crucial distinction between the "no evidence" standard and the *Jackson* standard is that, while a "mere modicum" of evidence precluded reversal of a conviction under the old standard, the *Jackson* approach calls for reversal of convictions supported by no more than a "modicum" of relevant evidence. *Id.* While the

*Jackson* standard provides for a more searching review of criminal convictions than did the rejected "no evidence" approach, the difference will affect very few cases in practice. *Id.* at 321–22, 99 S.Ct. at 2790–91. This case is illustrative. The evidence presented against appellant DeCorte can hardly be described as a "mere modicum." Thus, DeCorte fares no better under the slightly broader review commanded by *Jackson* than he would have under the earlier regime.

**3.** "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a); *see also Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

nation of fact, and with experience comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources." *Anderson v. Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Moreover, in limiting appellate review of findings of facts, Rule 52(a) encourages the parties to concentrate their efforts and resources on fully developing the facts at trial, thus maintaining the status of the trial as "the 'main event' ... rather than a 'tryout on the road.'" *Id.* at 575, 105 S.Ct. at 1512. (quoting *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)). And, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* (citing *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

In effect, DeCorte's attack on the sufficiency of the evidence in this case amounts to an argument that the trial judge should have believed DeCorte, rather than Blankenship. As the policies underlying Rule 52(a) should make clear, the argument is doomed at the outset. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* Blankenship's credibility may not have been unassailable, but neither was DeCorte's, and the trial judge saw fit to believe Blankenship. We refuse to superimpose our judgment over that of the finder of fact. And, as the government pointed out, DeCorte's speeding may have been necessary to meet his delivery deadline and the Cougar Express tractors may have been the best units available at Blade Shippers. At the same time, Blankenship's version of the

events was neither incoherent nor facially implausible, nor was it directly contradicted by extrinsic evidence. Thus, although some evidence supports DeCorte's claim of innocence, the evidence hardly excludes the possibility of guilt. We conclude that the district judge's choice between the two possible versions of the events at issue was not clearly erroneous, and the judge's ultimate finding that DeCorte was guilty beyond reasonable doubt was therefore not irrational.

In addition, contrary to DeCorte's argument, the district judge did not rely solely on Blankenship's testimony. The judge also relied on the testimony of Dorothy Steinman, from which the judge drew an inference that DeCorte "display[ed] guilty knowledge by looking for some sort of alibi." Moreover, the judge noted that DeCorte's explanation of the apparent lack of documentation on the trip was "unworthy of belief," and, furthermore, that DeCorte had lied to FBI agents during their investigation. Because the trial court's conclusions are supported in the record, we refuse to disturb them.

DeCorte's argument concerning the sufficiency of the evidence on the conspiracy count rests on somewhat firmer legal ground—at least it is not based on a credibility argument. DeCorte contends that the proof here was too tenuous to show beyond reasonable doubt that he agreed to join the conspirators' plan to steal and transport the shipment. However, we hold that the record contains sufficient evidence to demonstrate a conspiracy. This court often has defined a conspiracy as "a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *Whaley,* 830 F.2d at 1473; *United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985); *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983). DeCorte therefore is correct in arguing that the government must show an agreement to prevail on the conspiracy count; however, DeCorte understates the probative value of the evidence against him.

Although DeCorte casts his argument in terms of the sufficiency of the evidence, much of it focuses on the nature of the circumstantial evidence used to convict him—telephone records, lack of proper paperwork, attempts to cover up, and other suspicious behavior. But circumstantial evidence carries no less probative value than does direct evidence. *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986); *United States v. Towers*, 775 F.2d 184, 188 (7th Cir.1985). Furthermore, conspiracies are clandestine affairs; direct evidence of their existence only rarely will be available. *Mayo*, 721 F.2d at 1088. Thus, "[t]he nature of a conspiracy is such that its existence and the involvement of the co-conspirators in it must often be proved by circumstantial evidence." *Whaley*, 830 F.2d at 1473 (citing *Redwine*, 715 F.2d at 320); *see also United States v. Romans*, 728 F.2d 846, 858–59 (7th Cir.1984). In fact, circumstantial evidence may provide the sole support for a conviction. *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985). Finally, the evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' ... The trier of fact is free to choose among various reasonable constructions of the evidence." *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622, 625 (1st Cir.1983)).

Here, the government introduced testimony that DeCorte made several telephone calls during the trip, apparently to get instructions regarding the trailers. Telephone records introduced by the government confirmed that calls were made from the Milton Truck Stop to Joe Russo, an associate of Russo's, and a Zenith truck dispatcher—all at precisely the time DeCorte was making his calls from the truck stop. Blankenship testified that DeCorte had told him that "a man in Pennsylvania" would arrange for the pick-up of the trailers. Further, DeCorte himself testified that he met with Joe Russo to arrange for the trip, and both DeCorte and Snodgrass testified that Armenta was waiting for them when they delivered the trailers at R & M. In summary, the record contains substantial evidence that DeCorte cooperated with several other individuals before, during, and after the trip to Milton. From that evidence (as well as the evidence that DeCorte knew the trailers were stolen), the trial judge could and did rationally find that DeCorte knowingly agreed to join a conspiracy to steal the trailers and knowingly acted to further its aims. The trial judge's finding that DeCorte was guilty of conspiracy was based on rational inferences drawn from appropriate evidence. Such inferences will not be disturbed on appeal. *See, e.g., Whaley*, 830 F.2d at 1473–74; *United States v. Green*, 735 F.2d 1018, 1022–23 (7th Cir.1984); *Radtke*, 799 F.2d at 302; *Romans*, 728 F.2d at 858–60; *Redwine*, 715 F.2d at 319.

## II. Multiplicity

DeCorte maintains that he cannot be convicted of both possessing and transporting the trailers. In support of this contention, DeCorte argues that he could not possibly transport the trailers without simultaneously possessing them, thus he has been convicted twice for a single offense, in violation of the constitutional guarantee of freedom from Double Jeopardy.[4] DeCorte contends either that sections

---

4. Actually, DeCorte misreads the indictment, which charged him with possessing the trailers in Illinois, after their delivery at R & M. However, this distinction makes little difference here. DeCorte was in control and possession of the trailers continuously from the time he took them until they were discovered by the FBI. Thus, the government would not be free to split the continuous transaction to allow prosecution for both transporting and possession. *See Sanabria v. United States*, 437 U.S. 54, at 69–74, 98 S.Ct. 2170, at 2181–84, 57 L.Ed.2d 43 (1977). Because only a single transaction is involved here, DeCorte may be convicted of multiple offenses only if his conduct violated separate statutes that are "directed to separate evils." *Albernaz v. United States*, 450 U.S. 333, at 343, 101 S.Ct. 1137, at 1144, 67 L.Ed.2d 275 (1981); *see also Ball v. United States*, 470 U.S. 856, 861–64, 105 S.Ct. 1668, 1671–73, 84 L.Ed.2d 740 (1985).

We note that DeCorte does not question whether he was in control and possession of the trailers while they were at R & M. However, any such argument would be unavailing here. Joint or constructive possession may be proven

659 and 2314 are redundant in this case, *see Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); or that the possession charge necessarily merged into the transportation charge. *See United States v. Gaddis,* 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976); *Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). The question whether a defendant may be convicted of multiple offenses arising out of a single criminal transaction is a question of Congressional intent: Did Congress intend that the conduct at issue receive multiple punishment? *Garrett v. United States,* 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985). Our review of the language and structure of sections 659 and 2314 and our application of the familiar *Blockburger* test convince us that the two statutes "are directed to separate evils," therefore, DeCorte may be convicted and punished for both. *See Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981).

We begin with the language of the statutes. Section 659 provides that:

"Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen;

\*     \*     \*     \*     \*     \*

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more that $1,000 or imprisoned not more than one year, or both.

\*     \*     \*     \*     \*     \*

The carrying or transporting of any such money, freight, express, baggage, goods, or chattels in interstate or foreign commerce, knowing the same to have been stolen, shall constitute a separate offense and subject the offender to the penalties under this section for unlawful taking, and the offense shall be deemed to have been committed in ;any district into which such money, freight, express, baggage, goods, or chattels shall have been brought by such offender."

18 U.S.C. § 659. We find three elements of the statutory language instructive. First, the essence of a violation of section 659 is stealing; the statute primarily punishes those who steal or knowingly possess property stolen from an interstate shipment. *See United States v. Waronek,* 582 F.2d 1158, 1161 (7th Cir.1978) (applying § 659 to embezzlement). Second, the stolen property must be a part of an interstate shipment when it is stolen; subsequent shipment is not necessary to prove a violation. Finally, and most importantly, the statute specifically authorizes separate convictions for subsequent interstate shipment of the stolen property. And, while the statute provides that interstate transportation of stolen property will "subject the offender to penalties under *this section,*" 18 U.S.C. § 659 (emphasis added), the language does not indicate, and DeCorte does not argue, that interstate transportation of stolen goods covered by § 659 must be punished exclusively under "this section." *Id.; see also United States v. Eley,* 723 F.2d 1522, 1524 (11th Cir.1984) (prosecutions for theft under § 659 and for transportation under § 2314 did not violate Dou-

---

and will sustain a conviction under § 659, even if the individual defendant does not have direct control of the stolen property, so long as the prosecution produces evidence that codefendants or coconspirators together exercised suffi-

cient dominion. *See United States v. Parent,* 484 F.2d 726, 732–33 (7th Cir.1973); *United States v. Catalano,* 450 F.2d 985, 991 (7th Cir. 1971).

ble Jeopardy; because § 659 provides for separate prosecutions for theft and transportation, prosecuting transportation under § 2314 instead "seems to be a matter of form rather than a violation of Congressional policy"); and *cf. United States v. Kalsbeck*, 625 F.2d 123 (6th Cir.1980) (prosecutions for theft under § 659 and possession under § 2314 permissible). Instead, DeCorte argues simply that Congress could not have intended to punish separately both possession and transportation of goods stolen from an interstate shipment. This argument clearly is precluded by § 659's express provision for such dual punishment. *See Missouri v. Hunter*, 459 U.S. 359, 367–68, 103 S.Ct. 672, 678–79, 74 L.Ed.2d 535 (1983) (express provision for dual punishment precludes violation of Double Jeopardy clause based on dual punishment); *United States v. Harris*, 832 F.2d 88, 90–91 (7th Cir.1987) (per curiam) (same).

By contrast, § 2314 provides that:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more that $10,000 or imprisoned not more than ten years, or both."

18 U.S.C. § 2314. The essence of a section 2314 violation is interstate transportation, not theft or possession of stolen goods. In fact, section 2314 does not punish theft or possession at all. Moreover, this section does not require proof that the subject goods moved in interstate commerce before they were stolen (as does section 659), but afterward. Thus, the language of section 2314 reflects a concern with keeping stolen goods, whatever their source, out of interstate commerce. The language of section 659, on the other hand, demonstrates an intent to *protect* goods *legitimately* moving in interstate commerce from theft. These goals are quite separate. *Cf. United States v. West*, 562 F.2d 375, 378 n. 3 (6th Cir.1977) (comparing purpose of § 659 with

that of § 2313, dealing with interstate transportation of stolen vehicles).

The structure of the United States Code reinforces this distinction. Section 659 is part of Chapter 31 of Title 18 of the Code. 18 U.S.C. §§ 641–65. Chapter 31 includes sections proscribing theft or embezzlement of money or property (and possession of stolen money or property) in which the federal government has some regulatory or property interest. The subjects of Chapter 31 include, for example, public money and property, 18 U.S.C. § 641, 643–44, money deposited with courts, 18 U.S.C. § 645–47; bank deposits, 18 U.S.C. §§ 655–56; and other federally regulated funds, 18 U.S.C. §§ 657–58, 664–65. Two themes connect the various provisions of Chapter 31. First, the primary acts prohibited are stealing and possession of stolen property. Second, the property protected is a matter of federal interest before it is stolen. Thus, Chapter 31 reflects Congress's desire to protect specific categories of property (in which the federal government has a property or regulatory interest) from theft.

Again, we may contrast section 2314. Section 2314 is part of Chapter 113 of Title 18, dealing with the sale, receipt, or transportation of stolen goods. 18 U.S.C. §§ 2311–18. The individual sections of Chapter 113 proscribe either transportation of stolen goods in interstate or foreign commerce, 18 U.S.C. §§ 2313, 2314, 2316; or sale or receipt of stolen goods which have moved in interstate commerce, 18 U.S.C. §§ 2313, 2315, 2317; or both, 18 U.S.C. § 2318. No provision of Chapter 113 proscribes theft, nor does any section of Chapter 113 require any federal interest in the subject goods before they are stolen. Thus, Chapter 113 generally reflects a federal concern with protecting the channels of interstate commerce from stolen goods, whatever their source.

The familiar *Blockburger* test further reinforces our conclusion that sections 659 and 2314 "are directed toward separate evils." *Albernaz*, 450 U.S. at 343, 105 S.Ct. at 1144.[5] Under *Blockburger*,

---

**5.** *Blockburger* merely provides a rule of thumb which yields an approximation of Congressional intent in the absence of other evidence. *Albernaz*, 450 U.S. at 340–42, 105 S.Ct. at 1143–44.

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Here, the government could not convict DeCorte under section 659 without showing that the loads of televisions were part of an interstate shipment when De-Corte took them. *See United States v. Wills*, 593 F.2d 285, 286–88 (7th Cir.1979). No such showing was necessary to convict DeCorte of violating section 2314, which DeCorte would have violated even if the televisions were stolen from a factory (before they became part of an interstate shipment) or from a retail store (after interstate shipment had ceased). Conversely, the government could not convict DeCorte for violating section 2314 without showing that DeCorte transported the trailers in interstate commerce after they were stolen. *See, e.g., United States v. Presler*, 610 F.2d 1206 (4th Cir.1979); *United States v. Rogers*, 475 F.2d 821 (7th Cir.1973). No such showing is necessary for a section 659 conviction. Because DeCorte possessed goods stolen from an interstate shipment immediately upon taking the trailers from the Zenith storage lot, he would have violated section 659 even if he never moved the trailers out of Pennsylvania. Thus, the *Blockburger* test indicates the same result as do statutory language and structure; the statutes at issue state separate offenses.

In summary, "[a]ll guides to legislative intent" show that Congress intended that possession of goods stolen from an interstate shipment and interstate transportation of stolen goods may be prosecuted and

Thus, even if the statutes at issue failed to define separate offenses under *Blockburger*, section 659's explicit provision for separate punishment of possession and transportation might well allow dual punishment. *See Hunter*, 459 U.S. at 367–68, 103 S.Ct. at 678–79; *Harris*, 832 F.2d at 90–91; *cf. Eley*, 723 F.2d at 1524 n. 1 (Double Jeopardy claim might be cognizable if sentence imposed under § 2314 was greater than that

punished separately. *See United States v. Woodward*, 469 U.S. 105, 109, 105 S.Ct. 611, 613, 83 L.Ed.2d 518 (1985).[6] DeCorte's convictions under sections 659 and 2314 were not multiplicious and, therefore, do not implicate Double Jeopardy. DeCorte's conviction and sentence are

AFFIRMED.

available under § 659). However, because both the *Blockburger* approach and other indicia of legislative intent yield the same result in this case, we need not reach that issue.

6. Legislative history, ordinarily a relevant consideration, is too scanty here to aid our decision.