**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rodney ARCHAMBAULT, Defendant–Appellant.**

No. 94–3697.

United States Court of Appeals, Seventh Circuit.

Submitted July 7, 1995.

Decided Aug. 15, 1995.

Byron G. Cudmore, Asst. U.S. Atty., Springfield, IL, for plaintiff-appellee.

Brian T. Otwell, Adam Giganti, Huntley, Giganti & Otwell, Springfield, IL, for defendant-appellant.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Following a jury trial, Rodney Archambault was convicted of one count of conspiracy to commit mail fraud and fifteen counts of

aiding and abetting mail fraud. Archambault was sentenced to 15 concurrent 60–month terms of imprisonment to be served consecutive to a 45–month term of imprisonment resulting in an aggregate sentence of 105 months. On appeal, Archambault claims that the evidence did not support the jury's verdict and that the district court erred in departing upward from the applicable Sentencing Guidelines range. For the following reasons, the judgment of the district court is affirmed.

## PROCEDURAL HISTORY

The time frame alleged in the indictment was from April of 1988 to March of 1991. During this period, Archambault was incarcerated, first in the Texas Department of Corrections, and then in various federal correctional institutions.

In 1988, Archambault was serving a 15–year sentence for aggravated robbery in a Texas state prison at Huntsville. While serving the state sentence, he was one of 14 defendants named in a 72–count federal indictment for conspiracy involving the filing of 353 fraudulent federal income tax returns claiming a total of $1,044,920.58 in tax refunds. The amount of refunds actually paid by the IRS was $179,637.42. Archambault pleaded guilty and received an aggregate sentence of 25 years' imprisonment.

At or near the time Archambault was awaiting trial on his federal tax fraud charges in 1988, Archambault initiated a new "state" tax fraud scheme which is the subject of this appeal. Archambault obtained the assistance of several fellow inmates to carry out the plan, including Daniel Rios, Michael Goodin, William Holt, and Charles Haughn. Archambault would use their names and social security numbers to fill out state tax forms and fraudulently request tax refunds. These inmates would also help Archambault fill out the tax forms. Because he was a prisoner, however, Archambault was unable to mail the fraudulent tax returns to the applicable state departments of revenue and receive and cash the refund checks. Accordingly, he recruited several non-inmates to participate in his scheme. Archambault would send these individuals completed fraudulent tax forms and, pursuant to his instructions, they would mail the tax returns to the corresponding departments of revenue, rent post office boxes to receive the tax refunds, cash the refund checks, and mail a portion of the proceeds to Archambault.

Daniel Rios supplied Archambault with the names of family and friends willing to assist in the scheme. Included in the list of names was Daniel Rios' mother, Maria Garcia. During September of 1986, Archambault and Maria Garcia started corresponding. Maria Garcia soon became an instrumental part of his state tax fraud scheme. Archambault began mailing her envelopes filled with fraudulently completed tax returns (he would circumvent the prison's mail screening procedure by marking the packages "legal mail") and, in turn, she would mail out the returns to their respective state departments of revenue, receive the refunds in rented post office boxes, cash the checks, and send one-third of the proceeds to Archambault.

Archambault asked Maria Garcia to recruit more individuals to help with the scheme. Complying with his request, she recruited her children—Oscar Rios, Juan Garcia, Frank Garcia, Prendi Garcia, and Diana Zuniga—, and her friends—Joel Villanueva, Antonio Peralta, John Canales, Joanne Canales, Diamanta Canales, Jessie Ayala, and Juan Bocanegra—, to join in the scheme. All of these new recruits provided their names and social security numbers in return for proceeds from the resulting tax refunds. They also assisted in the preparation of typed W–2 forms, cashing refund checks, renting post office boxes, and mailing proceeds to Archambault (or other inmates working for him). The tax proceeds were, generally, split as follows: one-third to the individual who provided the social security number, one-third to the individual who prepared the return (usually Archambault), and one-third to the individual who cashed the check.

From August 21, 1988 through January 26, 1990, 21 false state income tax returns were prepared and mailed to the Illinois Department of Revenue. The false tax returns were claimed by Maria Garcia, Juan Garcia, Diamanta Canales, Diane Zuniga, Jessie

Ayala, Charles Haughn, Daniel Rios, Prendi Garcia, Oscar Rios, Antonio Peralta, John Canales, Frank Garcia, Joel Villanueva, Joanne Canales, and Michael Goodin. These returns claimed a total of $16,946.55 in income tax refunds. In total, Archambault filled out, or caused to be filled out, 173 fraudulent state income tax returns for 20 states, claiming $168,897.84 in fraudulent state income tax refunds.

As a result of this illegal activity, an indictment was filed charging Archambault and Haughn (who proved to be a high ranking member of the conspiracy) with one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (Count 1), and fifteen counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 and 1341 (Counts 2–16). After a jury trial, Archambault was convicted on all counts.[1]

For sentencing purposes these offenses were grouped under U.S.S.G. § 3D1.2 and resulted in a total group offense level of 19. With a criminal history category of VI, Archambault's applicable Guidelines range for his grouped offenses was 63 to 78 months' imprisonment. However, because Archambault continued operating his state tax fraud scheme while awaiting trial and during sentencing, the district court departed upward by increasing his offense level to 22, resulting in a range of 84 to 105 months' imprisonment. Because the highest applicable statutory maximum was 60 months' imprisonment (the statutory maximum for each of the sixteen counts was 60 months' imprisonment, 18 U.S.C. §§ 371 and 1341), the district court imposed 15 concurrent 60–month terms of imprisonment on Counts 1–15 to be served consecutive to a 45–month term of imprisonment on Count 16. See U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run

concurrently, except to the extent otherwise required by law."). This timely appeal follows.

## ISSUES

Archambault argues that (1) the evidence was not sufficient to support the jury's verdict; and (2) the district court erred in departing upward from the applicable guidelines range under U.S.S.G. § 5K2.0, p.s.

## SUFFICIENCY OF THE EVIDENCE

■ As a preliminary matter, we take note that there is nothing in the record to indicate that Archambault raised his challenge to the sufficiency of the evidence by way of a timely motion for a judgment of acquittal at the close of the evidence or within the seven-day period following the verdict, Fed.R.Crim.P. 29. "[F]ailure to do either waives any challenge on appeal to the sufficiency of the evidence absent a manifest miscarriage of justice." *United States v. Baker,* 40 F.3d 154, 160 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995). However, because the government does not argue that Archambault waived this challenge, it has waived Archambault's waiver. *Id.* Accordingly, we will review Archambault's claim as if it were raised below.

■ A challenge to the sufficiency of the evidence is reviewed as follows:

[W]e must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Johnson,* 26 F.3d 669, 684 (7th Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* [——] U.S. [——], 115 S.Ct. 344, 130 L.Ed.2d 300 (1994). We will not reweigh the evidence or judge the credibility of witnesses in making this determination. *United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993). We may reverse a

---

1. Haughn was a fugitive from justice at the time of trial and, therefore, was not tried with Archambault.

conviction " 'only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.'" *Johnson,* 26 F.3d at 684 (citation omitted).

*United States v. Lahey,* 55 F.3d 1289, 1292 (7th Cir.1995). In the first count of the indictment, Archambault was convicted of conspiracy to commit mail fraud. In order to prove the elements of a conspiracy, "the government must establish that (1) there was an agreement between two or more persons to commit an unlawful act; (2) the defendant was a party to the agreement; and (3) an overt act was committed in furtherance of the agreement by one of the coconspirators." *Id.* at 1293. Mail fraud is defined, in pertinent part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ..., for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, ..., or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years or both.

18 U.S.C. § 1341.

■ At trial, the government presented overwhelming evidence of Archambault's participation in (and organization of) the tax fraud scheme. Maria Garcia testified that pursuant to an agreement with Archambault, Archambault would fill out the fraudulent tax forms and mail them to her, and she would then mail them to the respective tax agencies, receive the refunds in a rented post office box, cash the refunds, and send Archambault one-third of all proceeds. Maria Garcia also testified that Archambault asked her to recruit others to help in the scheme, which she did, and that these recruits subsequently aided Archambault in obtaining illegal tax refunds. Maria Garcia's testimony was supported by the testimony of her son Juan Garcia and her daughter Diana Zuniga.

A fellow inmate of Archambault, Mike Goodin, testified that he helped Archambault by filling out fraudulent tax forms and using his name and social security number. This was all done at Archambault's request. Goodin also identified two blue books which, he testified, Archambault used to keep records of social security numbers he would use for completing the fraudulent tax returns and to keep track of the tax forms which had been completed and sent out. William Holt, another fellow inmate of Archambault, testified that he, too, had assisted Archambault in perpetrating his tax fraud scheme. Finally, Archambault's fingerprints and handwriting were on several fraudulent tax returns retrieved from the Illinois Department of Revenue.

Clearly, there was sufficient evidence to establish that there were agreements between Archambault and other individuals to place fraudulent state tax forms in the federal mails. The evidence likewise sufficiently demonstrates overt acts in furtherance of this conspiracy—the actual mailing of the fraudulent tax forms.

■ Archambault contends, however, that most of the witnesses providing testimony regarding Archambault's involvement in the conspiracy (i.e., Maria Garcia, Juan Garcia, Diana Zuniga, Mike Goodin, and William Holt), were cooperating with the government and had reason to understate their involvement in the scheme and overstate Archambault's involvement. This court has long held that " 'it is not the role of an appellate court to reexamine credibility determinations or reweigh the evidence.'" *United States v. Brookins,* 52 F.3d 615, 622 (7th Cir.1995) (quoting *United States v. DeCorte,* 851 F.2d 948, 952 (7th Cir.1988)). Accordingly, "[i]f a trial judge's finding is based on a decision to credit the testimony of a witness, who 'has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding if not internally inconsistent, can virtually never be clear error.'" *Id.* (quoting *DeCorte,* 851 F.2d at 953). Because the testimony presented by these witnesses was plausible and uncontradicted, there is no ba-

sis to question the district court's determination of credibility.

■ In Counts 2–15, Archambault was charged with aiding and abetting the actual placement of fraudulent Illinois tax returns in the United States mail. At trial, the government introduced 14 fraudulent 1988 Illinois tax returns which had been mailed to the Illinois Department of Revenue. The refund amounts and social security numbers in each return corresponded with the social security numbers and projected tax refunds Archambault had listed in his "blue books." The individuals named on the tax forms had been recruited into the scheme by either Maria Garcia at Archambault's request, or by Archambault himself. Count 16 charged Archambault with aiding and abetting the receipt of an illegal Illinois state tax refund check through the United States mail. At trial, Diana Zuniga testified that she received an illegal Illinois state tax refund check through the United States mail as a result of her assistance to Archambault in the conspiracy. Clearly, there was sufficient evidence to establish that Archambault aided and abetted the mail fraud specified in Counts 2–16.

It is claimed, however, by Archambault that Maria Garcia was a "pivotal person" in the tax fraud scheme since she recruited most of the individuals involved in the scheme and that she, not Archambault, instructed these other co-conspirators on how to prepare and mail the fraudulent returns. As mentioned above, Maria Garcia testified that these individuals were recruited at the request of Archambault and that their preparation and mailing of fraudulent tax returns was done in furtherance of Archambault's scheme. This court will not disturb the district court's credibility determinations. *Brookins,* 52 F.3d at 622. Archambault also maintains that since Charles Haughn did not testify, it might have been Haughn (and not Archambault) who was the leader of the conspiracy. Regardless of the absence of Haughn's testimony, the testimony presented by the government demonstrates Archambault's leadership role in the conspiracy.

Archambault next argues that because the "blue books" containing both the names and social security numbers of the participants in the tax fraud scheme, and a listing of the fraudulent tax returns that had been mailed, were seized from a cell which Archambault shared with Haughn, it is not clear that these books were Archambault's. At trial, however, Mike Goodin identified the books as Archambault's. Archambault additionally claims that since many of the fraudulent tax returns had fingerprints and handwriting of many of the other co-conspirators, its possible that the co-conspirators were acting on their own in mailing the fraudulent returns. This, however, is consistent with the government's theory that Archambault used these co-conspirators to help carry out his tax fraud scheme. Finally, Archambault argues that although the government introduced a folder containing various addresses of state departments of revenue and state tax forms, the government did not establish that it was Archambault's. This is of no consequence, however, because there was sufficient evidence to convict Archambault without the admission of this folder.

## UPWARD DEPARTURE

■ Archambault also asserts that the district court erred in departing upward from the Sentencing Guidelines. 18 U.S.C. § 3742(e)(3) provides for appellate review of a district court's imposition of a sentence outside the applicable Guidelines range—this court must determine whether the sentence "is reasonable in light of permissible factors and in view of the reasons given by the district court for a departure." *United States v. Sarna,* 28 F.3d 657, 661 (7th Cir. 1994). Accordingly, we have employed a three-part review of a district court's departure from the Guidelines:

First, we determine whether the district court has stated adequate grounds for the departure. This is a question of law and, as such, is reviewed *de novo.* · Second, we determine whether the facts cited in support of the departure actually exist. This determination is reviewed under the clearly erroneous standard. Third, we determine whether the degree of departure is linked to the structure of the Guidelines.

The district court's findings on the degree of departure are given deference.

*Id. See, e.g., United States v. Frazier,* 979 F.2d 1227, 1229 (7th Cir.1992); *United States v. DeFelippis,* 950 F.2d 444, 447–48 (7th Cir. 1991).

 After calculating Archambault's offense level of 19 and his criminal history category of VI, resulting in an applicable Guidelines range of 63 to 78 months' imprisonment, the district court decided that a three-level upward departure was warranted:

> First, the Government contends that because the Defendant continued his criminal conduct that an upward departure is appropriate. *See United [S]tates v. Keats,* 9[3]7 F.2d 58 (2nd Cir.1991); *United States v. Jordan,* 890 F.2d 968 (7th Cir. 1989). Second, the Government contends that an upward departure is justified based on the amount of "loss" of the continued criminal activity. *See* § 2F1.1. Both of the government's first two arguments for an upward departure are well grounded in fact and law.

> \* \* \* \* \* \*

> [B]ecause the Defendant continued his criminal activity while awaiting trial and because that continued criminal activity resulted in an increase of loss, an upward departure pursuant to U.S.S.G. § 5K2.0 is warranted.

(R. 34 at 3–4.)

*United States v. Jordan,* 890 F.2d 968 (7th Cir.1989), involved a similar upward departure—the district court departed because, like Archambault, the defendant had participated in criminal conduct while awaiting sentencing. This conduct was the same type of conduct for which the defendant had been convicted and sentenced. Because the defendant had not been convicted of these criminal acts prior to sentencing, they could not be used to enhance his sentence under U.S.S.G. § 4A1.1. The *Jordan* court held, however, that U.S.S.G. § 4A1.3 would support a departure under these circumstances. Section 4A1.3 provides, in pertinent part:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the de-

fendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning:

\* \* \* \* \* \*

> (e) prior similar adult conduct not resulting in criminal conviction.

U.S.S.G. § 4A1.3(e), p.s. Because the defendant had continued to engage in the same criminal conduct for which he was being sentenced, the *Jordan* court found that the defendant's criminal history category of VI did not adequately reflect the seriousness of his past criminal conduct or the likelihood of future criminal activity: "[t]he district court made a reasonable decision in finding that such activities bespeak a potential for future criminal conduct far beyond the factors that went into reaching Jordan's total offense level and criminal history category." *Jordan,* 890 F.2d at 977. Because the defendant was at the highest criminal history category, the *Jordan* court held that an enhancement by increasing his offense level was appropriate.

In light of *Jordan* and § 4A1.3, it is apparent that Archambault's continuing criminal activity constituted adequate grounds for an upward departure. The district court's departure, however, was also based on another factor—the amount of potential financial loss as a result of Archambault's continuing criminal activity. Because this potential financial loss occurred before the indictment was filed, it was not charged in the indictment and, therefore, the district court was not able to use it to increase Archambault's offense level by one point under § 2F1.1, comment. (n. 7). Nonetheless, in light of the significance placed on potential financial loss by the Sentencing Commission and the unique circumstances of Archambault's continued criminal activity (i.e., that it was the same type of criminal activity that he had been convicted for), a departure based on the amount of potential financial loss resulting from this continued criminal activity was proper. *See Sarna,* 28 F.3d at 661–62 ("A court may depart from the Guidelines based upon a factor supplementing those considered by the

Sentencing Commission.") (citing U.S.S.G. § 5K2.0, p.s.).

In addition, the district court's basis for departure is supported by the record. At sentencing, the government presented evidence showing that Archambault had continued to operate his state tax fraud scheme while awaiting trial and sentencing. Specifically, David Palmer, an inmate, testified that during this time period, he had been recruited by Archambault and that Archambault had targeted four new states for his tax fraud scheme.[2] The government also presented evidence establishing that Archambault had attempted to obtain an additional $122,000 in fraudulent refunds from the four new states that had been targeted.

Finally, considering the facts supporting the district court's reasons for departing, the three-level departure was reasonably linked to the structure of the Guidelines. *See Sarna,* 28 F.3d at 661. If Archambault had been convicted of this continued criminal activity, his total criminal history points would have increased by three, U.S.S.G. § 4A1.1.,[3] which, if he had not been at the highest criminal history category, would have increased his criminal history category by one level. This would have the same effect as increasing his applicable Guidelines range by approximately two levels. Moreover, if the potential loss of $122,000 had been included in the indictment, Archambault's offense level would have increased by one level. Accordingly, the district court's upward departure by way of a three-level increase of Archambault's offense level was not in error.

Nonetheless, Archambault argues that the district court's departure was "excessive" because (1) the district court failed to consider that his sentence was imposed to run consecutive to a sentence he was already serving; (2) Maria Garcia received a much more lenient sentence despite the fact that she was a major participant in the conspiracy; and (3) David Palmer received no sentence at all. Because Archambault committed the instant offense after sentencing, and while serving a prior term of imprisonment, the Guidelines required consecutive sentencing. U.S.S.G. § 5G1.3(a). Even if Archambault had not committed the instant offense after sentencing on his prior offense, since the criminal conduct underlying the prior sentence was not taken into account in determining the offense level for the instant offense, § 5G1.3(c) would have urged consecutive sentencing—at least "to the extent necessary to achieve a reasonable incremental punishment for the instant offense." U.S.S.G. § 5G1.3(c), p.s. This is reflective of the general principle that separate crimes deserve separate punishments. *United States v. Hill,* 48 F.3d 228, 232 (7th Cir.1995) ("[E]very separate violation of law deserves a separate sanction....").

Certainly, the district court, in deciding to depart upward, did not err in failing to consider the fact that Archambault would have to serve his entire prior term of imprisonment before beginning his current sentence. In addition, Maria Garcia received a more lenient sentence because she entered into a plea agreement with the government (and she was not the leader of the conspiracy). David Palmer received no sentence because the Government chose not to prosecute him.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

2. Archambault claims that Palmer lied about Archambault's continued criminal activity in order to obtain a reduced sentence on pending state criminal charges. However, as we have already stated, we will not review the district court's credibility determinations absent a finding of clear error. *Brookins,* 52 F.3d at 622. To this point, Archambault notes what he perceives as an internal inconsistency in Palmer's testimony—that although Palmer testified that he was not receiving any consideration for testifying, he later stated that he had been told that the government was advising the state's attorney of his cooperation and requesting that he be given whatever consideration the state's attorney found appropriate. If this was an internal inconsistency in Palmer's testimony, it did not relate to a material fact and, therefore, the district court's reliance upon Palmer's testimony was not clearly erroneous.

3. Specifically, Archambault would have received three points under § 4A1.1(a) for the prior conviction.