**UNITED STATES of America,**
Plaintiff–Appellee,

v.

Carol KOZINSKI, Ilmi Fejzoski, James Havelka, Jeanette Martinez, James Brennan, James Abney, Mark Morgan, and Peter Demopoulos, Defendants–Appellants.

Nos. 91–3774, 91–3812, 91–3851, 92–1173, 92–1462, 92–1485, 92–1571, 92–1602, 92–2114, 93–2420.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1993.

Decided Feb. 18, 1994.

Joel D. Bertocchi, Steven Shobat, Canella E. Henrichs, Asst. U.S. Attys., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, Rodger A. Heaton, Asst. U.S. Atty., Springfield, IL, Robert Christopher Cook, Office of U.S. Atty., Chicago, IL (argued), for U.S.

Linda Amdur, Chicago, IL (argued), for Carol Havelka and Carol Kozinski.

Robert A. Novelle, Joel A. Whitehouse (argued), Serpico, Novelle & Navigato, Chicago, IL, for Emil Fejzoski.

David C. Thomas, Chicago–Kent College of Law, Chicago, IL (argued), for James Havelka.

James A. Graham, Chicago, IL (argued), for Jeanette Martinez.

Richard M. Beuke, Robert S. Bailey (argued), Chicago, IL, for James Brennan.

Santo J. Volpe, Joel A. Whitehouse (argued), Serpico, Novelle & Navigato, Chicago, IL, for James Abney.

Robert A. Novelle, Joel A. Whitehouse (argued), Serpico, Novelle & Navigato, Chicago, IL, for Emil Fejzoski.

Patrick S. Moore, Chicago, IL (argued), for Mark Morgan.

John E. Horn, Tinley Park, IL (argued), for Peter Demopoulos.

Before BAUER, WOOD, Jr., and ESCHBACH, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The appellants in this case were each convicted of one count of conspiracy pursuant to 21 U.S.C. § 846,[1] and various counts of using a communication facility in committing, causing and facilitating the commission of federal drug crimes [2] in violation of 21 U.S.C. § 843. The eight appellants individually filed notices of appeal from their convictions. The appeals were then consolidated for briefing, argument, and decision.

## I.

Between 1985 and 1989, David Avery, a resident of Cook County, developed and operated a large network for the sale and distribution of cocaine throughout the metropolitan Chicago area. Avery initially entered into a drug partnership with the now-convicted drug dealer John Cappas. After a falling-out between the two, Avery and Cappas became rival drug dealers. Avery began to develop his own sources of supply and his own customers. Two of Avery's largest suppliers were Michael Pardo and appellant, Ilmi Fejzoski. The other appellants were also all involved in the Avery drug distribution network and dealt directly with Avery. The relevant activities of the various appellants and their roles in the Avery drug conspiracy are discussed below.

### A. James Abney.

James Abney first became one of Avery's customers in late 1987 or early 1988. Avery provided Abney with one-half kilogram of cocaine on a credit basis. Abney agreed to resell the cocaine. Avery also provided Abney with a code to use when calling Avery's pager. When Abney had successfully resold the cocaine, he returned to Avery, paid him the money due for the cocaine, and obtained another quantity of cocaine to resell. The quantities Abney purchased were normally one-half kilograms. The pattern was always the same. Abney would page Avery and tell him he needed cocaine. Avery would front Abney the cocaine, then Abney would pay Avery when he was finished reselling it. Avery testified that Abney purchased cocaine from him in this fashion roughly twenty-four times. At trial the government presented five taped telephone conversations related to transactions in which Abney purchased one-half kilogram quantities of cocaine from Avery.

### B. James Brennan

Avery began selling cocaine to James Brennan in 1986. Initially Brennan purchased quantities as small as one-eighth of an ounce. The amounts increased, however, to the point where Brennan would purchase kilograms from Avery every two or three weeks. Furthermore, Avery was personally present on numerous occasions when Brennan resold the Avery cocaine.

Brennan's role was not limited to purchaser/distributor. He also helped Avery package cocaine for resale. Beginning in 1988, he helped Avery rerock cocaine as well. Brennan maintained the subscription for Avery's portable telephone. Avery reimbursed Brennan for paying the telephone bills. Brennan also stored Avery's cocaine while the police searched Avery's home. Finally, Brennan accompanied Avery on an ill-fated attempt to purchase ten kilograms of cocaine from an-

---

1. The criminal objectives of that conspiracy included: (1) possession with intent to distribute cocaine; and (2) distribution of cocaine, both in violation of 21 U.S.C. § 841(a)(1).

2. Specifically, they were convicted of using the telephone to facilitate violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine) and 21 U.S.C. § 846 (conspiracy).

other supplier, James Kolalis. The government introduced nine taped telephone conversations between Avery and Brennan. These conversations related to cocaine transactions.

### C. Peter Demopoulos

Avery and Demopoulos met through a mutual friend in 1986; Avery sold Demopoulos one-eighth of an ounce of cocaine. Later Demopoulos began dealing directly with Avery. Avery often sold him amounts of cocaine ranging from one-eighth of an ounce to eight ounces. These transactions occurred roughly 100 times. Avery testified that he had at times fronted cocaine to Demopoulos. After Demopoulos became delinquent on his account, however, Avery insisted that all transactions be on a cash basis. Sometimes these cocaine transactions involved other people that Demopoulos knew. On at least two occasions when Avery sold cocaine to Demopoulos, a woman by the name of Cheryl Evans was present. Evans was an acquaintance of Demopoulos. During these transactions, Avery delivered cocaine to Demopoulos and Evans gave Avery a check for the purchase price of the cocaine.

The government introduced seven taped telephone conversations between Avery and Demopoulos. The conversations related to Avery selling cocaine to Demopoulos. As evidence that Demopoulos was not only a purchaser of cocaine but also involved in the resale, Avery testified that in two of these conversations he understood Demopoulos to be referring to his own customers.

### D. Carol Kozinski[3] and James Havelka

One of Avery's drug customers introduced him to Havelka and Kozinski in 1986. They began buying cocaine from him then and continued through 1989. Sometimes only one person, Havelka or Kozinski, was present at the sale. Between the two, they purchased cocaine from Avery approximately 100 times. Kozinski purchased amounts ranging from one-eighth to three ounces.

Havelka generally purchased one or two ounces per transaction. Much like with Demopoulos, Avery fronted cocaine to Havelka and Kozinski, but began demanding cash when their accounts became overdue.

Another witness at trial, William Littlejohn, testified about drug transactions between Avery, Havelka, and Kozinski. He accompanied Avery during the sale of one ounce to Havelka. Avery asked Havelka for the money for the cocaine. Havelka stated that he could not provide it yet because "the guy wasn't there yet with the money." Littlejohn was also present on one occasion when Kozinski met Avery to purchase cocaine; Kozinski was not alone but accompanied by another woman.

On March 16, 1990, DEA agents arrested Havelka, pursuant to a warrant, in his home, which he shared with Kozinski. Havelka consented to a search of the house. During the search the agents found: drug paraphernalia; a triple-beam scale; and a mixture of inositol powder (used to dilute cocaine for resale).

During the trial, the government introduced three taped telephone conversations between Havelka and Avery, four conversations between Avery and Kozinski, and three conversations involving all three people. The conversations again related to cocaine transactions. Avery testified that during one of these conversations he understood Kozinski to be discussing one of her customers who was bothering her to get cocaine. The tapes reflected at least three one-half ounce sales to Kozinski at a time when she was pregnant.

### E. Mark Morgan

Avery sold cocaine to Morgan on at least five occasions. The amounts he sold ranged from one to three ounces. One of the witnesses at trial testified he was with Avery during two deliveries of cocaine to Morgan in June or July of 1989; both deliveries were of two to three ounces. The government presented taped telephone conversations at trial that indicated Morgan had his own resale

---

**3.** Carol Kozinski lived with James Havelka for many years and held herself out as his wife. As a result of this there was some confusion regarding her name. Some documents, including the indictment, refer to her as Carol Havelka. Her name is Carol Kozinski and for the remainder of the opinion she will be referred to as "Kozinski." James Havelka will be referred to as "Havelka."

customers. In one conversation Morgan made reference to his "guys" and said that they were leaving for San Diego and wanted to "do some biz" and provide "help to our bizness." Morgan further stated that some of the cocaine Avery sold him was "all filler" which bothered his "guy" because he "goes over stuff with a fine tooth comb." Four days later in another telephone conversation, Morgan told Avery that he "got rid of everything" and needed to purchase more cocaine. Avery subsequently delivered two ounces of cocaine to Morgan.

### F. Jeannette Martinez

Martinez was the girlfriend of Michael Pardo, a major supplier of cocaine to Avery. At one point Pardo was incapacitated and could not deal directly with Avery. Martinez agreed to help by attempting to purchase and deliver a supply of cocaine. Martinez eventually supplied Avery with one kilogram of cocaine. She also aided Pardo by packaging and delivering small quantities of cocaine.

### G. Ilmi Fejzoski

Avery testified to at least five transactions in which Fejzoski supplied Avery with kilogram quantities of cocaine. During one transaction, Avery's girlfriend, Gina Jensen, was present. Avery paid Fejzoski for three kilograms of cocaine in his apartment and then received the cocaine from Fejzoski's associate who was outside in a truck. On another occasion, Fejzoski attempted unsuccessfully to buy three kilograms of cocaine from Avery in Springfield, Illinois.

Avery was arrested in October of 1989. He agreed to plead guilty and cooperate with authorities. Ultimately the Grand Jury indicted twenty-nine defendants, including the eight appellants in this case. All defendants were separated into four groups for trial. Abney, Brennan, Demopoulos, Havelka, and Kozinski were tried before a jury along with co-defendant Paul Anzilotti. Morgan and Fejzoski were each granted separate bench trials.[4] Martinez received a jury trial along with co-defendant Effran Herrera–Soto.

## II.

After these cases were consolidated, appellants Kozinski, Havelka, Abney, Brennan, and Demopoulos jointly filed a consolidated brief raising common issues for review. All of these appellants, except Abney, also filed individual briefs raising issues unique to their individual appeals. Appellants Morgan, Martinez, and Fejzoski filed only their individual briefs and do not join in the consolidated brief. In total the appellants have raised over twenty distinct issues. We address the various arguments below grouped by the particular appellants raising them.

### A. Kozinski, Havelka, Abney, Brennan, and Demopoulos

#### 1. Exclusion of proffered testimony

These five appellants were tried in the same jury trial before Judge Plunkett. In the course of that trial David Avery testified at length about his transactions with each of them. His partner, Sam Musillami, also testified. The appellants sought to call Nick Mathews, Thomas Briscoe, and Janet Harris as witnesses to impeach the testimony of Avery and Musillami. The witnesses were to testify to facts that were different than those Avery and Musillami presented. Judge Plunkett ruled that the proffered testimony attempted to impeach Avery and Musillami on collateral matters; therefore, as extrinsic evidence, it would not be allowed.

The appellants now argue that the testimony the witnesses were to offer amounted to eyewitness accounts of activities charged in count one (conspiracy) of the indictment that were different than the accounts the government's witnesses provided. Therefore, they argue, it is "impeachment by contradiction" and permissible. Impeachment by contradiction is a valid method of impeachment and "simply involves presenting evidence that part or all of a witness' testimony is incorrect." *Simmons, Inc. v. Pinkerton's, Inc.,* 762 F.2d 591, 604 (7th Cir. 1985). Admittedly this is precisely what the appellants were attempting. Nonetheless, one may not impeach by contradiction regarding "collateral or irrelevant matters."

---

4. In addition Fejzoski pled guilty to related charges in the Central District of Illinois.

*Id.* Our inquiry therefore returns to whether the proffered testimony relates to collateral matters. Something is collateral if it "could not have been introduced into evidence for any purpose other than contradiction." *United States v. Jarrett,* 705 F.2d 198, 207 (7th Cir.1983), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). In other words, one may not contradict for the sake of contradiction; the evidence must have an independent purpose and an independent ground for admission. Moreover, the question of what is a collateral matter is squarely within the discretion of the trial court. *See Taylor v. National R.R. Passenger Corp.,* 920 F.2d 1372 (7th Cir.1990) ("Our standard of review in determining whether the district court committed reversible error in either the admission or exclusion of evidence is abuse of discretion."). *Id.* at 1375. We therefore consider whether the district court abused its discretion by concluding that the proffered testimony of the three witnesses related to collateral matters.

### a. Testimony of Nick Mathews

■ On cross-examination, government witness Sam Musillami testified that Mathews owed Avery money, and that Avery told Mathews to pay Musillami. Musillami further testified that he did not recall if Mathews had paid him $3,000. Counsel for appellant Brennan sought to have Mathews testify that he did in fact pay Musillami $3,000 on his debt to Avery. Assuming that this does in fact "contradict" Musillami's testimony, a debatable point at best, the district court nonetheless ruled that this was a collateral matter and refused to allow the testimony. Both at the trial and now on appeal the one and only reason appellants offer to justify bringing this testimony in is to "directly contradict[ ] Musillami's testimony for the government." (Appellants cons. brief at 15). They offer no explanation why the payment of this money would be admissible aside from contradiction. We believe this testimony to be wholly irrelevant to the issues in the trial. The trial did not involve a contract dispute between Mathews and Musillami, rather a drug conspiracy. The testimony does nothing to make the existence of any material fact more or less probable. Fed.R.Evid. 401.

For these reasons we hold that the district court did not abuse its discretion in deciding that the matter was collateral.

### b. Testimony of Thomas Briscoe

■ Musillami testified on direct examination that he began purchasing cocaine from Avery in 1988. Defense counsel attempted to call Thomas Briscoe to say that Musillami actually began purchasing cocaine from Avery in 1986 or 1987. Again this distinction of when a person, who was not a defendant in the case, began purchasing cocaine is irrelevant to any of the issues of guilt or innocence of the appellants. Counsel for the appellants did not at trial and did not in their brief to this court provide any explanation why this testimony is not collateral. Its only function would be to contradict and impeach on an irrelevant point. Excluding this testimony was a proper exercise of discretion by the district court.

### c. Testimony of Janet Harris

■ On direct examination, Avery testified that he and John Cappas, once partners, had a falling out and became rivals. This falling out occurred when the two went to collect a drug debt from a female customer. Avery testified that Cappas acted wildly and, wielding a gun, threatened the customer. Both Cappas and Avery were arrested and the two never did business with one another again. The defense counsel sought to have Janet Harris, the above-mentioned customer, testify that Avery, not Cappas, was the wild gun-wielder who made the threats. The district court concluded that:

> Ms. Harris ... is not an appropriate witness in this case.... [Her testimony] doesn't impeach the witness Avery on any meaningful point.... It's a collateral issue. It's at a time when [Avery] was in a partnership with Cappas, which has absolutely nothing to do with how he operates his business, or, if it does, it's so marginally relevant that it doesn't mean anything.

We agree. The Avery cocaine network at issue in this conspiracy case began after the falling-out with Cappas. The specific events that brought an end to the Avery–Cappas

relationship are merely background information for the events charged in count one of the indictment. The proffered testimony has no purpose other than to buttress a claim that the witness was lying. Merely attempting to prove that a witness is lying is not a proper purpose of impeachment by contradiction. *Simmons Inc.,* 762 F.2d at 604. The district court, therefore, committed no error in excluding the testimony.

### 2. The application of the "Buyer–Seller" defense to 21 U.S.C. § 843(b)

The appellants were convicted of using a communication facility to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843(b). They argued that if they were using the telephone to purchase cocaine for their own use, the buyer-seller defense should apply and preclude conviction under section 843(b). The district court instructed the jury that the buyer-seller defense was a valid defense to the conspiracy charge. On the telephone charges, however, the court gave the following instruction:

> Concerning the use of a telephone, however, a person may facilitate the distribution of drugs without regard to what the person does or intends to do with the cocaine that is purchased.

The appellants claim that this instruction was improper. We reject their argument on this point.

The statute in question reads as follows:

> It shall be unlawful for any person knowingly or intentionally to use [the telephone] in ... facilitating the commission of any act or acts constituting a felony under any provision of [Title II of the Comprehensive Drug Abuse Prevention and Control Act].

21 U.S.C. § 843(b). Distributing cocaine is felony under that act. 21 U.S.C. § 841. The appellants were charged with using the telephone to facilitate that distribution. If, by their use of the telephone, the appellants have made the distribution of the cocaine easier, they have facilitated it and violated the statute. *United States v. Binkley,* 903 F.2d 1130, 1135–36 (7th Cir.1990). What they do with the cocaine after it is distributed is irrelevant to whether they facilitated

the distribution; the crime is complete long before they either use or dispose of the cocaine. The "subsequent treatment of the cocaine cannot retroactively diminish [the] previous facilitation of [the distribution]." *Id.* at 1136. Under the clear terms of the statute a person who uses a telephone to assist the distribution of cocaine, and then consumes the cocaine is as culpable as the one who uses the telephone to assist the distribution, and then gives the cocaine to another to consume.

In sum, the defendants' status as buyers or distributors is of no consequence regarding section 843(b); rather, their status as facilitators alone gives rise to criminal liability. For that reason, we reaffirm the holding in *Binkley* that the buyer-seller defense has no effect on 21 U.S.C. sec. 843(b).

### B. Carol Kozinski

In addition to joining in the consolidated brief, Kozinski raises three separate arguments to support her claim for a reversal of her conviction. First she contends that the government presented insufficient evidence of her involvement in the conspiracy. Next she argues that David Avery should not have been permitted to testify about and "interpret" telephone conversations in which he was a participant. Finally, she argues again that she was entitled to an instruction stating that the buyer-seller status is a defense to the telephone charges.

### 1. General principles of conspiracy law

To establish that a defendant is guilty of conspiracy, the government must prove that "the defendant knew of the conspiracy and intended to join and associate himself with its criminal design and purpose." *United States v. Auerbach,* 913 F.2d 407, 414–15 (7th Cir.1990). We will only reverse a jury verdict if no "rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *United States v. Colonia,* 870 F.2d 1319, 1326 (7th Cir.1989). Furthermore, we will allow a jury to infer from circumstantial

evidence that a conspiracy existed. *United States v. Townsend,* 924 F.2d 1385, 1391 (7th Cir.1991) ("Conspiracies, like other crimes, may be proved entirely by circumstantial evidence."). *Id.*

 A buyer-seller relationship between two people cannot, by itself, establish a conspiracy. *Id.* at 1394. Rather a conspiracy requires "an agreement to commit some other crime beyond the crime constituted by the agreement itself." *United States v. Lechuga,* 994 F.2d 346, 349 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). Therefore, if the only agreement is for the seller to sell, and the buyer to buy, an amount of cocaine no conspiracy exists. *Id.* It is not even sufficient if the evidence shows a buy-sell agreement but also shows that the buyer ultimately resold the drugs; rather, the resale must have been contemplated by the original two parties and must have been part of the "conspiratorial" agreement. *Id.* On the other hand if the seller agrees to sell cocaine to the buyer, and the buyer agrees to buy, specifically for the purpose of having that buyer later distribute the cocaine to others (i.e. an agreement that the buyer become a distributor) a conspiracy does exist—there is an agreement beyond the mere sale for personal consumption. *Id.*

 There is little, if any, clarity in this circuit regarding the evidence necessary to demonstrate this agreement to distribute. We have, however, located a few relevant factors and will focus largely on them. "Conspiracies, like all business ventures, are typically distinguished by cooperative relationships between the parties that facilitate the achievement of the goal." *Townsend,* 924 F.2d at 1395. Furthermore, they are evidenced by "lower transaction costs." *Id.* at 1394. If the parties "must negotiate the terms of every transaction, [or] seek to maximize their gains at the expense of others, . . . the transaction costs among the group are [probably] high" and a conspiracy probably does not exist. *Id.* Transactions in large quantities of drugs,[5] prolonged cooperation between the parties,[6] and "[e]vidence that the parties have standardized their transactions with one another"[7] are all relevant factors in determining if a conspiracy exists. Finally, if A sells drugs to B who then distributes the drugs, and A "knows of, and benefits from, B's subsequent distribution, we may infer a limited agreement to distribute between A and B." *Id.* at 1392.

### 2. Evidence of Kozinski's involvement in the conspiracy

 Based on all of the above factors, the evidence presented at trial formed a sufficient basis for a jury verdict that Kozinski was a co-conspirator with Avery. The taped telephone conversations between Kozinski and Avery allow a jury to infer that Kozinski had resale customers and she received supply from Avery. In one conversation on June 30, 1989, Kozinski expressed concern that she had not heard from Avery in some time. She mentioned that one of her acquaintances, who was also concerned that Kozinski had not heard from Avery, lamented "what . . . am I gonna do." Kozinski responded by saying "relax . . . if somethin' happens I'm sure I'd know." Avery testified that he understood Kozinski to be referring to her customer who impatiently sought cocaine from her, and that Kozinski was telling her to relax while she contacted her supplier, Avery. Viewing this conversation in the light most favorable to the government, we find that the jury could reasonably draw that same inference. This is evidence of Kozinski's role as distributor.

 The financing arrangement between Avery and Kozinski also suggests that she acted as a distributor during an ongoing relationship. Avery fronted cocaine to Kozinski, then when she repaid him he gave her a fresh supply. Selling cocaine to Kozinski on credit suggests that Avery took a stake in her business—he received payment after,

---

**5.** *See United States v. Lechuga,* 994 F.2d 346, 347 (7th Cir.1993) (holding that the quantity of drugs involved is relevant but not sufficient standing alone to prove a conspiracy).

**6.** *Id.* at 350.

**7.** *Id.* at 363–64 (Cudahy, J., concurring in part and dissenting in part).

and as a result of, her resale. Although standing alone, the credit transactions are insufficient evidence of an agreement for Kozinski to be a distributor,[8] when taken with the evidence of her resale that inference does follow. The quantity of the drugs sold is also relevant. Avery sold cocaine to Kozinski thirty to forty times in amounts ranging from one-eighth ounce to three ounces. Some of these transactions took place at a time when Kozinski was pregnant. Because of the amounts and Kozinski's pregnancy, a jury could reasonably conclude the cocaine was not for personal use. Viewing the evidence in the light most favorable to the government, the strongest inference is that a pregnant woman is not going to consume three ounces of cocaine.

Kozinski rarely needed to negotiate the terms of the sales with Avery; rather, she merely requested amounts. Furthermore they communicated in code. Kozinski's home phone number was located in Avery's personal phone book also. All of these factors suggest standardized transactions and lower transaction costs in the business as well as a continuing relationship. Finally, a search of Kozinski's residence revealed, a triple-beam scale, drug paraphernalia, and powdered mixture used to dilute cocaine for resale.

The overall evidence is more than sufficient to show: that Kozinski was involved in a long-term business relationship with Avery where he supplied drugs; she prepared them for resale to her customers; and each person had a stake in the other's business (i.e. they were joint venturers). For all of the above reasons, the jury could reasonably conclude that Kozinski knowingly entered into an agreement with Avery to be a distributor of the drugs he sold her.

■ Kozinski also objects to the district court allowing Avery to testify about the context and meaning of conversations to which he was a party. Specifically, Avery testified that when Kozinski was speaking about another person, he believed she was speaking about her customer. At trial, counsel for Kozinski objected that this was impermissible opinion testimony of a lay witness

and excludable under Federal Rule of Evidence 701. The district court overruled the objection.

■ We will only reverse a trial court's evidentiary ruling if it abused its discretion. *Taylor*, 920 F.2d at 1375. In this case the defendant argued that this was impermissible opinion testimony. Avery was a participant in those conversations and was testifying about his understanding of the thoughts that were being communicated to him. Similarly in *Binkley*, a witness testified that he understood a reference in a phone conversation to "the other thing" to mean cocaine. 903 F.2d at 1134–35. This court held that a jury could therefore reasonably conclude that the interpretation was correct.

Avery certainly had personal knowledge of his own mental processes during those conversations and is competent to testify regarding them. If Kozinski intended something other than what Avery perceived, she was free to testify that Avery misunderstood her. At that point the jury could weigh the credibility of both interpretations and reach a conclusion. Because Avery was merely testifying about his impressions about what was being communicated to him, the district court did not abuse its discretion by allowing the testimony.

Kozinski's final argument, that she was entitled to an instruction applying the "buyer-seller" defense to the telephone charges, bears no scrutiny in light of our holding in *Binkley*, and our holding in section II.A.2. of this opinion.

## C. James Havelka

At trial, Havelka moved to suppress physical evidence seized from his home. The court denied that motion. Havelka now challenges the denial of the Motion to Suppress as well as the computation of his sentence under the Sentencing Guidelines.

On March 16, 1990 four federal and state law enforcement agents, acting pursuant to a valid arrest warrant, arrested Havelka at his home. The agents ultimately obtained Havelka's written consent to search his resi-

8. *Id.* at 363.

dence. Havelka and the agents, however, presented differing accounts of the events leading up to that consent. At the hearing on Havelka's Motion to Suppress the agents testified that they entered Havelka's apartment, handcuffed him, placed him on the couch, and read him his rights. Special Agent Nancy Lane held a gun to Havelka's side during the first few minutes of the arrest and then holstered it after he was handcuffed. While he was handcuffed and seated on the couch the agents asked for his permission to search the apartment. Havelka, who was now visibly calmer than when he was arrested, signed a written consent form.

Havelka testified that Agent Lane pointed a gun at his head during the arrest and demanded to know where the drugs were. He claims that she then told Havelka, who was scared and confused, that they would have taken his baby away if he had been there during the arrest. Finally he claims that he only signed the consent form because he was frightened and thought he could not refuse. He did admit that Agent Lane had to stretch up to reach her gun to his head and that all other agents were polite and never drew their guns. He admitted that no agent was physically abusive and no guns were drawn when he signed the consent form.

■ The district court weighed the evidence and the credibility of the witnesses and adopted the agents' version of the events and ruled that the consent was voluntary. We will not upset such a factual determination unless it is clearly erroneous. *United States v. Dickerson,* 975 F.2d 1245, 1249 (7th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993). We will give deference to the district court's credibility determination and use the agents' testimony in our analysis. *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). Therefore, we may only reverse the district court's ruling if, based on the facts presented by the agents, its decision that the consent was voluntary was clearly erroneous.

■ When determining the voluntariness of the consent, the district court must look to the "totality of all the circumstances," *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973), and may consider factors such as: age, education, and intelligence of the defendant; advisement of his rights; how long he was detained prior to the consent; repeated requests for consent; physical coercion; and whether he was in custody. *United States v. Rojas,* 783 F.2d 105, 109 (7th Cir.), *cert. denied,* 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986).

■ In this case Havelka, who owned his own business, did not lack any mental capacity to form consent. Although Havelka was handcuffed, no agent physically or mentally coerced him. He was only detained for "a few minutes" prior to being asked for his consent so there is no concern that he was worn out and consenting from sheer exhaustion. He was nervous initially, but he had calmed down by the time he consented. He was advised not only of his *Miranda* rights, but also of the right to refuse to consent. The agents did not ask for his consent repeatedly or harass him in any fashion. Furthermore, Havelka stated to the agents that he had nothing to hide. Based on this evidence, the district court's ruling of voluntariness was not clearly erroneous.

■ Havelka also challenges the manner in which the district computed his sentence under the Sentencing Guidelines. His first complaint is that the court attributed too much cocaine to him. The district court applied Sentencing Guideline section 2D1.1. The proper amount of cocaine for a conspirator is the amount "actually distributed and the amount involved in transactions reasonably foreseeable to him." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993). We will only upset the district court's determination of this amount if it is clearly erroneous. *Id.* Finally, the determination of the actual amount must be based on "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

■ In this case Avery, a co-conspirator, testified that Havelka bought cocaine from him "at least fifty times," and that he usually

purchased "ounces, an ounce, two ounces, sometimes less." On this basis the district court took a very conservative estimate and calculated that Havelka purchased cocaine fifty times. Although the record would have supported finding that Havelka normally purchased ounces, the district court again took a conservative approach and determined that Havelka purchased only half-ounce quantities. Therefore the total was twenty-five ounces (fifty transactions at one-half ounce each).

Havelka's only argument that the calculated amount was improper is as follows: the district court's determination of the amount of cocaine was clearly erroneous because he only purchased from Avery twenty-five times and usually purchased between an eighth of an ounce and half of an ounce. Havelka points to nothing in the record to support his estimate of the number of transactions. Regarding the quantities of cocaine, Havelka's argument is also without merit. As stated above, Avery's testimony was as follows:

Q. Generally what quantities did you sell [to Mr. Havelka]?

A. Ounces, one ounce, two ounces, sometimes less.

To refute this Havelka draws our attention to testimony in which Avery recalls selling Havelka less than an ounce. This testimony is, however, perfectly consistent with that quoted above. Based on the record, the district court committed no error in finding that Havelka purchased an average of one-half ounce at each transaction or that he purchased cocaine fifty times. Therefore, its determination that the appropriate amount of cocaine is twenty-five ounces (700 grams), was not clearly erroneous.

Next Havelka argues that the district court attributed to him amounts of cocaine that Kozinski purchased. Again this argument lacks any merit and stems from an inexplicable misreading of the record. The record is clear, the district court **did not** attribute any of Kozinski's transactions to Havelka.

Havelka's third sentencing argument arises from yet another misreading of the record. He contends that the district court erroneously denied him a reduction in his Offense Level for "Acceptance of Responsibility." The district court found, however, in no uncertain terms, that Havelka had "accepted responsibility for what he did" and awarded him the corresponding two level reduction. We will not remand a case and instruct a district court to do what it has already done.

■ He also insists that he was entitled to a downward adjustment in his Offense Level because he was a "minor participant" and an addict on the lowest rung of the organization. In reality, Havelka was a significant distributor of cocaine who purchased it from Avery, in quantities up to two ounces, on at least fifty occasions. He played a crucial role in getting cocaine to end users, the ultimate goal of the conspiracy. We find that the district court did not err in concluding that Havelka was not a minor participant.

Finally Havelka contends that the district court incorrectly computed his Criminal History under the Sentencing Guidelines. He received one point for a prior sentence of supervision pursuant to Sentencing Guidelines section 4A1.1(c) and two additional points under section 4A1.1(d) because he committed his federal drug offenses while under that sentence. These three Criminal History points gave him a History Category of II. Combining that with the Offense Level of 24,[9] his sentence range was 57–71 months. U.S.S.G. § 5A. The district court ultimately sentenced him to 60 months imprisonment.

■ The Sentencing Guidelines make clear that a "prior sentence" is "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere.*" U.S.S.G. § 4A1.2(a)(1). In 1989 Havelka was charged with criminal damage to property in Illinois; the court entered an order of supervision. In Illinois a court may defer prosecution and impose supervision if the defendant pleads guilty, or if

---

**9.** Havelka was involved with 700 grams. Therefore his Base Offense Level was 26. The court then awarded a two level reduction for acceptance of responsibility leading to a level of 24.

he stipulates to "facts supporting the charge or a finding of guilt." 730 ILCS 5/5–6–1(c). The first option, pleading guilty, necessarily involves an admission of guilt. The record contained no evidence, however, that Havelka pled guilty. The second option in that statute, the stipulation, does not in any way equate with an admission of guilt or an adjudication of guilt. Although it is possible that an Illinois court may make a finding of guilt prior to imposing supervision (e.g. after the defendant pleads guilty), such a finding is not a necessary predicate to the imposition of supervision under the statute.[10] Because the record contains no evidence to the contrary, we must conclude that the sentencing court in Illinois did not make a finding of guilt against Havelka.

The Sentencing Guidelines state that a "[d]iversion from the judicial process without a finding of guilt (e.g. deferred prosecution) [does not count as a prior sentence]." U.S.S.G. § 4A1.2(f). We find that Havelka's supervision was such diversion from the judicial process because the Illinois statute specifically speaks of "defer[ring] further proceedings" and the sentence did not result from a finding of guilt. Therefore, the district court committed plain error by deeming it a prior sentence. Havelka should not have received Criminal History points and he should have been in a History Category of I.

This error, however, does not mandate a remand for resentencing. Even after determining that the district erred in sentencing, we need not remand if we find, "on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States,* — U.S. —, — – —, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992). In this case the district court was obligated to impose the sentence it did. The Sentencing Guidelines specifically state that the sentence imposed

may not be "less than any statutorily required minimum sentence." U.S.S.G. § 5G1.1(c). Havelka was properly sentenced based on his involvement with 700 grams of cocaine. His statutory minimum sentence was five years (60 months):

> In the case of a violation ... involving ... 500 grams or more of ... cocaine, ... [the defendant] shall be sentenced to a term of imprisonment which may not be less than 5 years.

18 U.S.C. § 841(b)(1)(B). Therefore even if Havelka had a History Category of I (in which case the range would have been 51–63 months) the district court would still be required to sentence him to five years (60 months).

### D. Peter Demopoulos

Demopoulos argues that the evidence at trial was insufficient to establish his participation in the Avery drug conspiracy. For a discussion of the standard of review on this claim and the evidence necessary to establish a conspiracy, see section II.B.1. of this opinion.

The evidence at trial showed that Demopoulos purchased cocaine from Avery roughly 100 times. On many of these occasions Demopoulos bought eight ounces at a time. Avery frequently fronted cocaine to Demopoulos but ceased that practice when he became delinquent with payments. The price that Avery charged for an ounce of cocaine went down as Demopoulos bought larger quantities.

Both Avery's testimony and taped telephone conversations demonstrate that Demopoulos purchased cocaine from Avery for the purpose of resale to customers. On several occasions Demopoulos paid Avery with checks written by Cheryl Evans, a female acquaintance of Demopoulos. Avery also testified about a number of transactions in which Demopoulos indicated he was ready to

---

**10.** The government cites *United States v. Stowe,* 989 F.2d 261, 262–63 (7th Cir.1993), for the proposition that supervision under Illinois law involves a "finding of guilt." This is a misreading of *Stowe.* In that case the defendant had pled guilty to the state law charges and was sentenced to supervision. We held that this was a "prior sentence" under the guidelines. In

reaching that conclusion, however, we cited the guideline which stated that "[a] diversionary disposition resulting from a finding **or admission of guilt** [counts as a prior sentence]." U.S.S.G. § 4A1.2(f) (emphasis added). There is no evidence in this case that Havelka admitted his guilt on the state law charges and *Stowe* is inapplicable.

do a "big deal." Avery would deliver eight ounces of cocaine to Demopoulos at his house or in an alley where another "guy" was present. Demopoulos would take the cocaine, drop it off, and come back with the purchase money for Avery.

In two taped telephone conversations Demopoulos discussed reselling cocaine to customers. In the first he complained to Avery that "these broads are waiting man, they're going crazy." Avery testified that he understood Demopoulos to need cocaine for women with whom he was waiting. Avery later sold cocaine to Demopoulos. On another occasion, Avery had fronted cocaine to Demopoulos, who became delinquent with payment. Sometime later Avery asked him "what's up?" Demopoulos referred to another person and told Avery that "he just left here" and if Avery would come to his house at seven o'clock Demopoulos would "get [Avery's] money." Avery testified that he understood Demopoulos to be talking about getting the payment from his customer.

■ The jury had before it sufficient evidence to conclude that Avery agreed with Demopoulos that the latter would distribute Avery's cocaine. The two men were engaged in a long-term, ongoing business relationship whereby Avery supplied cocaine to Demopoulos who then facilitated their common goal by distributing it, or reselling it, to end users or customers. Demopoulos purchased large quantities (supporting an inference that he was a distributor). He was involved in over 100 transactions (suggesting a prolonged period of cooperation between the two). In some of those transactions Avery was specifically responding to the demand of Demopoulos' customers by promptly supplying him with cocaine. Demopoulos also received bulk discounts from Avery—his supplier (indicating lower transaction costs from large deals). He made reference to his customers in telephone conversations. Furthermore, Avery was often paid for supplying drugs only after Demopoulos received payment from his resale customers (suggesting a cooperative effort and that Avery benefitted from Demopoulos' distributorship). Based on this evidence, a rational jury could conclude that Demopoulos was a member of the Avery conspiracy.

Demopoulos also argues that he was denied effective assistance of counsel at trial. Specifically he claims that his attorney prejudiced him by calling Cheryl Evans as a defense witness because her testimony ultimately corroborated a portion of Avery's testimony. Recall that Avery testified that Evans gave him checks for the purchase price of Demopoulos' cocaine. The government was contending that Evans therefore was a resale customer of Demopoulos. Demopoulos' attorney called Evans as a defense witness for the purpose of having her explain that the checks were not for her purchase of cocaine from Demopoulos but loans to him. Ultimately the jury either did not accept Evans' testimony as true or gave Avery's testimony greater weight. In either case Demopoulos now claims that because Evans' testimony corroborated the fact that she indeed gave checks to Avery, the decision to call Evans deprived him of effective assistance of counsel.

■ To establish that he was denied effective assistance of counsel, Demopoulos must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984). To satisfy the first prong, the defendant must show that the attorney's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. On this point, we will "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Furthermore, the decision whether to call a defense witness is a strategic decision. We must afford such decisions "enormous deference." *United States v. Hirschberg,* 988 F.2d 1509, 1513 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993). Even if we were not to afford that deference, we would still reject appellant's claim of ineffective assistance of

counsel. Not only was there a reason to call Ms. Evans as a defense witness, there was a very sound and justifiable reason. Avery had testified that Evans gave him checks for Demopoulos' cocaine, and he believed she was a resale customer. The resale part of the relationship was one of the crucial elements that took the agreement beyond mere "purchase for personal use" and into the realm of conspiracy. Rebutting that testimony was crucial and the attorney attempted such a rebuttal with Ms. Evans' testimony that she was not purchasing cocaine but making a loan to Demopoulos. The fact that the jury may not have believed her cannot render the decision to call her as a witness incompetent. The attorney's decision was well within the range of reasonable professional assistance.

### E. James Brennan

Brennan's first challenge on appeal is that he was not properly sentenced under the Guidelines. He claims that the district court sentenced on him on the basis of an excessive quantity of cocaine, which quantity was not supported by the evidence or the Sentencing Guidelines.

■ When sentencing a defendant in a drug conspiracy, the court may only attribute to him the amount of cocaine he was actually involved with and the amount involved in foreseeable transactions. *Goines,* 988 F.2d at 775. In this case the court found that Brennan was personally responsible for at least fifteen kilograms of cocaine. It reached its conclusion based on the following calculation. The defendant admitted to being responsible for two to three and one-half kilograms of cocaine (including one kilogram based on testimony that he assisted Avery in rerocking cocaine). The court then added ten kilograms based on Avery and Brennan's joint attempt to purchase ten kilograms from another supplier. The total at that point was twelve to thirteen and one-half kilograms. Finally the court noted that the evidence of Brennan's rerocking and other activity was more than sufficient to bring the amount over fifteen kilograms. We review this determination for clear error only. *Id.*

■ The thrust of Brennan's argument is that there was not sufficient evidence to support a finding that the attempted ten kilogram purchase was part of the conspiratorial agreement. We disagree. On an evening in 1988, Avery and Brennan drove to a predetermined location to purchase ten kilograms of cocaine. Brennan was driving the car and Avery was carrying the money for the purchase, $175,000. When the two arrived at the scene the would-be seller approached the car and discussed the details of how the sale was to proceed with Brennan, not Avery. Avery then handed the money to the seller, who attempted to abscond with it. Although they were unsuccessful in purchasing the cocaine, Brennan and Avery did recover the cash. Brennan and Avery "talked about [the event] a lot that night." We find that the district court was not clearly in error when it found that Brennan was sufficiently involved with this attempt to bring the ten kilogram amount within the realm of the conspiratorial agreement. Therefore, these ten kilograms were properly included in the sentencing calculation. Brennan admitted to being involved with two to three and one-half kilograms. This demonstrates a minimum of twelve kilograms thus far. Additionally, Avery testified that at one point Brennan was rerocking cocaine at the rate of one kilogram per month and that by 1989 Brennan was purchasing one half kilogram every two to three weeks. All of this combined is ample support for the district court's conclusion that the total amount of cocaine attributable to Brennan exceeded fifteen kilograms.

■ Brennan also claims that the district court improperly denied his motion to sever his trial from the other defendants. Brennan's argument on this point is vague and rather weak. Brennan was tried as an alleged supplier/distributor of cocaine. The other defendants at his trial were only alleged distributors who were relying on the personal use or buyer-seller defense. Therefore they all testified that they purchased cocaine from Avery, but claimed it was not for distribution. Brennan now claims that this testimony of the other defendants corroborated testimony that Avery was a drug dealer. Brennan next argues that because

he and Avery were "longtime friends and associates" this corroboration placed him in an "unenviable position" and resulted in gross unfairness. Brennan, however, makes no attempt to identify what actions of the court made his trial unfair. The most that can be said of his argument is that the other defendants, as alleged distributors, presented a defense (namely the buyer-seller defense) that was inconsistent with his, as an alleged supplier/distributor and that as a result the trial was grossly unfair. This argument fails as a matter of law. The Supreme Court held in *Zafiro v. United States*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), that antagonistic defenses alone will not support a motion for severance. *Id.* —— U.S. at ——, 113 S.Ct. at 938. Therefore, we hold that the district court acted well within its discretion in denying the motion for severance. *Id.*

### F. Mark Morgan

Morgan was convicted, after a bench trial before Judge Plunkett, of one count of conspiracy to distribute cocaine and two counts of using the telephone to facilitate federal drug crimes. He mounts several challenges to his conviction and sentence and we address them below.[11]

#### 1. Sufficiency of the evidence

■ Morgan's first argument is that the government failed to present sufficient evidence to convict him of conspiracy. For a general discussion of conspiracy and the evidence necessary to convict a defendant of it see section II.B.1. of this opinion. The government presented evidence in the form of Avery's testimony and two taped telephone conversations between Avery and Morgan. Morgan presented a defense based upon his own testimony and other evidence. The district court weighed the evidence and the credibility and found that the government's evidence was credible and Morgan's evidence was not. We will not upset that determination here. *See United States v. DeCorte*, 851 F.2d 948, 953 (7th Cir.1988).

The evidence that the government presented clearly shows that Morgan and Avery were involved in an ongoing relationship whereby Morgan received cocaine from Avery, often on credit, for the purpose of distributing it or selling it to his customers. In one telephone conversation, Morgan indicated to Avery that the two would have to do some "wheelin and dealin this week ... sorta like major big time." Morgan further indicated that the reason he needed to effectuate such a major deal was that his "guys [were] leaving for San Diego" and before they leave "they want to do some biz" (i.e. "some help to our bizness.").[12] Finally Morgan complained to Avery that his customers were upset with the last delivery of cocaine because it was all filler. He told Avery that his "guys" go over the stuff with a "fine tooth comb." Avery agreed to resolve the problem. Avery testified that he understood Morgan to be referring to his customers. Both Avery and Musillami also testified that Morgan purchased ounce quantities of cocaine. Musillami also testified that he made two deliveries to Morgan of two to three ounces of cocaine. Avery testified further that he often fronted cocaine to Morgan and he dealt with him on more than two occasions. The district court "inferred from the totality of Morgan's contacts with Avery and the nature of their relationship that an agreement existed" and found Morgan guilty of conspiracy.

---

11. Morgan makes one argument that we can dispose of without lengthy discussion in the text. Prior to trial the government stipulated that the transcripts of the phone conversations between Morgan and Avery were "true and accurate copies." One transcript includes a line in which Morgan refers to Avery as an "eight-ball." Avery testified that he thought Morgan called him a "goof-ball" instead. The government attempted to ask Morgan about that during cross-examination, but acting upon objection from Morgan's counsel the court refused to allow the question stating that the issue was resolved by the stipulation. Morgan now claims that this short-lived attempt to ask that question violated the stipulation agreement. This argument has no merit. Even if such questioning were to violate the stipulation, it would be irrelevant because the judge prohibited pursuing that line of questions. Furthermore the court specifically stated that in making its findings it was not relying on the reference to "eight-ball" in any way.

12. This is corroborated by the fact that Morgan's phone records show calls to San Diego after this conversation but not before.

We hold that based upon the evidence a rational trier of fact could indeed find that Morgan knowingly participated in a conspiracy with Avery by agreeing to distribute cocaine. First, Morgan and Avery had an ongoing business relationship (Morgan referred to their "bizness" in telephone conversations and in fact transacted with Avery on numerous occasions). Second, Morgan and Avery benefitted from one another in a cooperative relationship. Avery benefitted from Morgan's resale in at least two ways: (1) he was often paid only after Morgan resold the cocaine; and (2) he was able to sell more cocaine after Morgan depleted his stock. Morgan benefitted from Avery's acts also in at least two ways: (1) upon Morgan's request Avery agreed to resolve quality control problems that interfered with the smooth functioning of Morgan's resale operations; and (2) Morgan was able to take the cocaine on credit. This cooperation between the two suggested that they were working together to achieve a common goal—the distribution of cocaine to end users. Finally, Morgan was purchasing ounce quantities of cocaine, an amount that is consistent with resale. For these reasons we affirm Morgan's conviction for conspiracy to distribute cocaine.

## 2. Sentencing—quantity of cocaine

Morgan argues that the district court sentenced him based on an improper calculation of the quantity of cocaine attributable to him. We will only upset the district court's determination of the amount of cocaine involved if it is clearly erroneous. *Goines,* 988 F.2d at 775. In this case Morgan's co-conspirator, Avery, testified that he dealt with Morgan for roughly nine months in 1989 and that he sold cocaine to Morgan twice each month. The district court, using a conservative approach, found that there was only adequate evidence for concluding that Morgan bought cocaine twice a month for a two and a half month period. Therefore, the court concluded that he was engaged in five transactions. Although there was testimony that in many of these transactions Morgan purchased two to three ounces of cocaine, the court, again erring on the side of caution, only attributed one ounce quantities to Morgan. The final result was that

Morgan was personally involved in five transactions for one ounce each. The court thus sentenced him on the basis of five ounces. *See id.* Not only was there adequate evidence for these findings, but these are more conservative estimates than the evidence would have allowed. The district court's findings were therefore not clearly erroneous.

## 3. Ineffective assistance of counsel

Morgan argues that his trial counsel was ineffective and raises six particular alleged trial errors to support that argument:

1. Counsel failed to subpoena telephone records;

2. Counsel filed a short post-trial motion;

3. Counsel failed to call Morgan's drug counselor as a witness;

4. Counsel failed to subpoena Michael Torres as a witness;

5. Counsel did not bring to the district court's attention "numerous inconsistencies in Avery's prior testimony"; and

6. Counsel's "closing argument was disorganized and ineffective."

The standards necessary to show ineffective assistance of counsel are outlined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and discussed above. Morgan fails to meet those standards.

Morgan's first four purported errors clearly resulted in no prejudice to his trial. *See id.* at 694, 104 S.Ct. at 2068. Although Morgan's counsel failed to subpoena telephone records, such a subpoena was hardly necessary in light of the fact that the government voluntarily released those records to the defense counsel. Second, Morgan's first post-trial motion was indeed short; however, the court permitted appellate counsel to file a supplemental post-trial motion that was of satisfactory breadth and coverage and superseded the allegedly deficient prior motion. Third, the relevant testimony that Morgan's drug addiction counselor could have provided was inadmissible hearsay because it consisted of statements he made to her that, as the district court found and we

agree, were not necessary for treatment. *See* Fed.R.Evid. 803(4).[13]

■ Additionally, the testimony Michael Torres was to provide, regarding his contact with David Avery had already been provided by Avery. To the extent that Torres would have testified that Morgan did not sell cocaine we conclude such testimony would not have changed the result of the trial. Not only is there no possibility that Torres could have personal knowledge of what Morgan did or did not do with the cocaine, but the testimony would not have eradicated the clear statements in the phone conversation between Avery and Morgan. In those conversations Morgan admitted that the two needed to do some "major big time" "dealin'" to satisfy his "guys" before they left for San Diego. The trial judge placed great weight on those conversations as evidence that Morgan was a distributor and we find that Torres' testimony would not have weakened this evidence and would not have resulted in a different verdict.

■ The remaining two "errors" require only slightly more scrutiny. Morgan claimed that on cross-examination of Avery his counsel failed to identify various inconsistencies in Avery's prior testimony. Counsel's cross-examination, in fact identified many inconsistencies, and was roughly as extensive as the direct testimony. We hold that any failure to identify remaining prior inconsistent statements resulted from decisions of trial strategy. Consequently we afford them "enormous deference" and conclude that they did not result in constitutionally deficient performance. *See United States v. Hirschberg*, 988 F.2d 1509, 1513 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993).

■ Finally, Morgan claims that his counsel's closing argument was disorganized and ineffective. We disagree. Morgan first claims he was prejudiced when his attorney told the court that the government witnesses "could be telling the truth." He takes this quote so drastically out of context that it takes on a totally different meaning. The actual quote was "it is humanly possible that [the witnesses] could be telling the truth." This statement was used as hyperbole and to set a dramatic backdrop for the argument to follow in which counsel detailed how unlikely it truly is that they were telling the truth. This is not constitutionally deficient performance.

■ Morgan next points to a place in the closing argument at which counsel says, as he begins to explain his argument regarding the phone conversations, that "if this were a jury trial my charts [of the language in the conversations] would be right here." This statement was merely an introduction to his very detailed discussion regarding those conversations and in no way indicated that he was ill-prepared for argument as the fifteen pages of transcript that follow clearly show. We conclude that these two statements do not render the closing argument deficient in any way. Counsel for Morgan identified weaknesses in the government's case, focussed heavily on Morgan's strongest arguments for acquittal, and provided lucid and complete explanations and arguments regarding Morgan's defense of being an addictive user of cocaine rather than a distributor. For these reasons we reject Morgan's argument that he was denied effective assistance of counsel.

4. New trial based on "New Evidence" and alleged *Brady* violations

■ While this appeal was pending Morgan filed a motion for a new trial based upon some "new evidence" that he had discovered while incarcerated. Morgan identified a witness, James Doorn, who testified in a sworn statement that on two occasions he witnessed Avery deliver cocaine to Morgan. He did not know the amount of the cocaine but said that he saw the package as Avery threw it through the passenger window and it looked small, like an eighth of an ounce. On the second delivery, again Doorn did not know the amount but said it looked smaller than the first amount. Finally Doorn stated in his

13. The counselor stated in an affidavit that she was prepared to testify that Morgan told her that

he had not sold drugs.

declaration that on one occasion, Avery told him that Morgan was a "new guy" who "wasn't buying much." Doorn also stated that he gave this information to prosecutors before Morgan's trial. Morgan filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 claiming: (1) he was entitled to a new trial because of the newly discovered evidence; and (2) he was entitled to a new trial or acquittal because the prosecution wrongly suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied Morgan's motion. Morgan raises the same arguments on this appeal.

■■■■ To establish a right to a new trial based on new evidence, the defendant must show that the evidence:

(1) came to [his] knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial.

*United States v. Kamel*, 965 F.2d 484, 490 (7th Cir.1992). The decision whether to grant a new trial lies with the discretion of the trial court and we only reverse if there was an abuse of discretion.

In this case the district court considered the new evidence and determined that it was merely impeaching and cumulative and that it would not have led to an acquittal. We find no abuse of discretion in that decision. Judge Plunkett, who ruled on Morgan's motion for new trial, was also the trier of fact originally. He heard all of the testimony and other evidence. He made specific findings that Morgan's defense was incredible in every respect. He specifically chose to believe the testimony of Avery, and Musillami, and he gave great weight to the telephone conversations in which Morgan admitted to doing some "major big time" "dealin'." Judge Plunkett found that the testimony of Doorn merely related to two additional cocaine sales and did nothing to undermine the evidence of other cocaine sales, described in Avery and Musillami's testimony and the phone conversations. We hold that because Judge Plunkett had observed the demeanor of the wit-

nesses, heard the testimony and telephone conversations, and found substantial evidence of various cocaine transactions and based the guilty verdict on it, and because Doorn's testimony merely offered evidence of two additional cocaine sales without any certainty concerning the amount sold (it did not and could not diminish the evidence of any other transactions), that the district court did not abuse its discretion in ruling that Doorn's evidence did not raise a reasonable likelihood of a different verdict at a new trial.

■■■■ Morgan next claims that the government suppressed Doorn's evidence, that the evidence was exculpatory and thus acquittal or a new trial is proper under *Brady*. The district court assumed without deciding that the evidence was exculpatory and suppressed by the prosecution. We will follow suit. Nevertheless in order to mount a challenge under *Brady*, Morgan must show that the suppressed evidence was material. *United States v. White*, 970 F.2d 328, 337 (7th Cir.1992). Evidence is material if there is a reasonable probability that it would have changed the outcome at trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A "reasonable probability" is a probability sufficient to undermine the confidence in the outcome. *Id.* We will only reverse the district court's ruling that the evidence was not material if it committed an abuse of discretion. *United States v. McAnderson*, 914 F.2d 934, 947 (7th Cir.1990).

The district court in this case gave great consideration to each of Morgan's arguments and determined that Doorn's evidence would not have changed the result of the trial. Morgan now claims that this ruling was an abuse of discretion. He argues that he would have put Doorn's testimony to use in two ways: (1) it would have corroborated his defense; and (2) it would have impeached Avery.

■■■ The district court found Morgan's defense to be incredible in every respect. Morgan claimed that he lied about having customers and lied about those customers moving to San Diego merely because he did not want Avery to know he was using all of

the cocaine himself and freebasing it. Nothing in Doorn's testimony supports Morgan's wholly incredible defense. Doorn will say that Avery told him at one point in 1989 that Morgan was a new guy and not buying much cocaine. We have no doubt that when Morgan first began buying cocaine he would be classified as a new guy. This testimony does not weaken the other evidence that after that point Morgan dealt with Avery (in Morgan's own words) "major big time." This testimony thus is useless to his defense. Next Doorn would testify on two occasions Morgan purchased "small" amounts of cocaine. This evidence simply adds two more transactions to the transactions already in evidence and supported by Avery's testimony, Musillami's testimony, and Morgan's own words in his telephone conversations with Avery. Adding more transactions, of whatever size, we believe is very unlikely to bolster Morgan's defense. For these reasons we hold that the district court did not abuse its discretion in concluding that the allegedly suppressed evidence was not material and could not form the basis for a *Brady* violation.

**■■■** Morgan next claims that the evidence would have been useful to impeach Avery. Suppression of impeachment evidence can also give rise to a *Brady* violation. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The evidence, however, must be more than "cumulative" impeachment. *United States v. Dweck,* 913 F.2d 365, 371 (7th Cir.1990). Here Morgan claims that Doorn's testimony would impeach Avery's claim that Morgan purchased in two to three ounce quantities. Assuming that Doorn could have given any relevant or reliable evidence regarding the quantity of drugs that flew past him and out the car window, and assuming that these transactions were the same transactions to which Avery testified (two very questionable assumptions indeed), the evidence would nonetheless be cumulative impeachment. Avery was, in the words of the district court, already "thoroughly impeached." The district court in fact only accepted Avery's testimony when it was corroborated, as it was in this case by Musillami's testimony as well as Morgan's extremely inculpatory statements in his telephone conversations. Evidence

that impeaches an already thoroughly impeached witness is the definition of "cumulative impeachment" evidence and its suppression cannot give rise to a *Brady* violation. Therefore the district court did not abuse its discretion and Morgan is not entitled to a new trial or acquittal.

### G. Jeannette Martinez

Martinez was convicted of one count of conspiracy and six counts of using the telephone to facilitate a drug crime. At trial the government presented two critical bodies of evidence regarding the conspiracy. The first was testimony by Oscar Acuna. Acuna is Martinez' cousin and along with Michael Pardo was a major supplier of cocaine to Avery. Acuna testified that Martinez delivered eleven grams of cocaine to him. Avery testified, however, that on another occasion Martinez delivered one kilogram of cocaine to him. The jury found Martinez guilty of conspiracy under count one of the indictment. The district court, finding Avery's testimony to be credible, sentenced Martinez based upon the one kilogram amount of cocaine.

**■■■** Martinez argued at trial that she was entitled to a special verdict form for the jury. She argued that the amount of cocaine involved would affect her ultimate sentence; therefore, a special verdict form was necessary to determine whether the jury found her guilty of a conspiracy involving eleven grams of cocaine (as Acuna testified) or one kilogram (as Avery testified). The jury is not, however, responsible for determining the amount of cocaine involved. It is only responsible for determining guilt or innocence. *United States v. Trujillo,* 959 F.2d 1377, 1383–84 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992). Furthermore the quantity of drugs involved is not an element of the offense of conspiracy. *Id.* at 1381. Therefore the jury has no duty to consider it. Once the defendant is found guilty of conspiracy, the judge must then determine the amount of drugs involved, by a preponderance of the evidence standard, and sentence the defendant accordingly. *Id.* at 1381–82. Even if the jury were to find that Martinez only possessed eleven

grams, the judge could, within his discretion, reject that determination and sentence her based upon a larger quantity. *Id.* at 1384. The quantity of cocaine involved in this case in no way affects Martinez' participation in the conspiracy; it affects only her sentence. Martinez is arguing that conspiracy to possess eleven grams of cocaine is a different crime than conspiracy to possess one kilogram of cocaine. She is mistaken. Although the two are punished differently, the crimes are identical—conspiracy to possess cocaine in violation of 21 U.S.C. § 846.[14] Therefore we find that Martinez was not entitled to a special jury verdict form concerning the amount of cocaine. *See Trujillo,* 959 F.2d at 1384.[15]

### H. Ilmi Fejzoski

 Fejzoski was convicted in a bench trial of conspiracy under count one of the indictment. At sentencing, the district court made a determination that Fejzoski was personally responsible for seven kilograms of cocaine. Fejzoski challenges that factual determination and claims that three of those kilograms should not have been attributed to him. We review factual determinations for clear error. *United States v. White,* 903 F.2d 457, 460 (7th Cir.1990). The district court had included the three kilograms based on testimony by Avery, that he purchased them from Fejzoski. Fejzoski now claims that Avery's testimony was incredible and the district court should not have accepted it or based a sentence upon it.

 An appellate court is not a trier of fact. It is not our role "to reexamine credibility determinations or reweigh the evidence." *United States v. DeCorte,* 851 F.2d 948, 952 (7th Cir.1988). Rather, this was the role of the trial judge in this case for only he "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City,* 470

U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Any argument that the trial judge should have disbelieved a certain witness is "doomed at the outset." *DeCorte,* 851 F.2d at 953. We agree with the district court that Avery's testimony regarding the three kilogram transaction was "complete" and in our view a facially plausible story and was not contradicted by any extrinsic evidence; therefore, the district court's finding that Avery's story was credible was not and could not have been erroneous. *See Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512.

 Fejzoski next claims that he was entitled to a two point reduction in his sentence level for "Acceptance of Responsibility." *See* U.S.S.G. § 3E1.1. The district court denied the request for a reduction and again we review that decision for clear error. *United States v. Yanez,* 985 F.2d 371, 374 (7th Cir.1993). Furthermore the Guidelines provide that this determination "is entitled to great deference on review." U.S.S.G. § 3E1.1, Note 5. Fejzoski claims that he fully accepted responsibility and went to trial only to contest the amount of cocaine involved. This is a rather ineffective argument. If Fejzoski truly accepted responsibility for his involvement in the conspiracy, he could have contested the extent of that involvement in a sentencing hearing rather than a complete trial. Instead he went to trial insisting that he was a smaller distributor than he actually was and denying his true involvement with the Avery conspiracy. Fejzoski did not, and in point of fact to this day has not, accepted responsibility for the true extent of his actual involvement in the Avery conspiracy; rather, he accepted responsibility only for little more than half of the conduct for which he was convicted and sentenced. We hold therefore that the district court's determination that he was not entitled to the reduction was not erroneous. *See, e.g., United States v. Williams,* 936 F.2d 698, 702 (2d Cir.1991) (affirming the denial of a

---

**14.** We also reject Martinez' argument that conspiracy to possess eleven grams is a lesser included offense in conspiracy to possess one kilogram. *See United States v. Trujillo,* 959 F.2d 1377, 1383 (7th Cir.1992) (" 'the nature and quantity of the controlled substance are relevant only to sentencing and do not constitute elements

of a lesser included offense.' "). *Id.* (quoting *United States v. Williams,* 876 F.2d 1521, 1525 (11th Cir.1989)).

**15.** None of the cases Martinez cites in her brief affect our holding.

reduction for a defendant whose "acceptance of responsibility related to only a portion of the conduct for which he was convicted"). *Id.*

## III.

These appellants were well-represented in this court. Their arguments, however, are to no avail when examined against the record. For the above reasons, the convictions and sentences of the appellants are

AFFIRMED.